UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| WESTPUBLISHING CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case File No. _____ |
| | ) |
| LEGALEASE SOLUTIONS, LLC, | ) |
| | ) |
| Defendant. | ) |

COMPLAINT

Plaintiff West Publishing Corporation ("West"), by and through its attorneys, asserts the following cause of action against LegalEase Solutions, LLC ("LegalEase"). In support of its claims, West alleges the following:

1. West provides industry-leading legal technology solutions, proprietary information, and legal online research platforms to a broad array of subscribers, including companies and law firms. Among the products offered by West is Westlaw®, a legal research platform, which is available via a paid subscription.

2. Upon information and belief, LegalEase offers legal research and writing support services to attorneys and law firms. For example, LegalEase advertises its ability to provide attorneys with court pleadings and motions, discovery documents, draft contracts and agreements, legal research memoranda, claims research analysis and demand letters, and appeal briefs.

3. In 2008, LegalEase entered into a contract with West (a Thomson Reuters business) to access Westlaw®. At all relevant times, LegalEase paid West a subscription fee that was less than $5,000 per month for its subscription to Westlaw®.

4. In January, 2018, West provided notice of termination of LegalEase's access to all Westlaw® products. West informed LegalEase that its sharing of Westlaw® passwords with employees of a separate company violated the terms of their contract.

5. From 2013 until July, 2017, LegalEase's use of Westlaw® was about 6,000 transactions per month, which, upon information and belief, is consistent with LegalEase's stated use of the product, namely to assist it in preparing legal writing for law firms, in-house counsel, and other attorneys.

6. According to LegalEase, in July, 2017 it was working with a machine learning and artificial intelligence firm to create a new legal research product. As part of this undertaking, LegalEase "fed" the "machine" with "tons and tons of legal research."[1] In a July, 2017 interview, LegalEase stated the following with respect to LegalEase's business:

> One of our clients is a machine learning legal research firm that's using artificial intelligence to create a much stronger legal research product. We're feeding this machine <u>tons and tons of legal research</u> that we're doing manually, to help train that machine to do this automatically. And we are already seeing the power of this type of technology.[2]

---

[1] *See* http://www.reinventingprofessionals.com/tag/tariq-hafeez/ beginning at 12:55 (last accessed on May 25, 2018).

[2] *Id.*

Upon information and belief, LegalEase obtained this "legal research" from Westlaw®.

7. Beginning in about July, 2017, LegalEase's use of Westlaw® spiked, eventually reaching approximately 236,000 transactions[3] per month, which is a twenty-fold increase over LegalEase's historical usage pattern and represents a usage rate greater than the average monthly usage of the "AmLaw 100" law firms.[4]

8. Upon information and belief, LegalEase was only able to obtain the "tons and tons of legal research" from Westlaw® between, at least, July, 2017 and January 17, 2018, by breaching its Subscription Agreement (as defined herein) with West. Upon information and belief, LegalEase, among other things, deployed computer programs, automated processes, or "bots" to capture and store Westlaw® information, and shared Westlaw® passwords with multiple individuals (including, upon information and belief, non-LegalEase employees) in violation of the Subscription Agreement.

9. Upon information and belief, LegalEase stored and conveyed Westlaw® information obtained during this period to its "machine learning" customer, thereby further violating LegalEase's agreement with West and other of West's legal rights.

---

[3] For the purposes of this complaint, a "transaction" refers to any executed search, as well as any viewing, printing, downloading, or emailing of a specific document.

[4] The "AmLaw 100" is a list generated by The American Lawyer that ranks the largest 100 law firms in the country by revenue. *See* *https://www.law.com/americanlawyer/almID/1202784597030/* (last accessed on May 25, 2018).

10. West's termination of LegalEase's Westlaw® subscription was effective on January 17, 2018. Nonetheless, LegalEase still proclaims to this day, that: "[u]sing powerful legal research tools including . . . Westlaw, combined with our years of experience researching a vast array of legal issues for corporate customers and law firms, the LegalEase team is well equipped to research a diverse array of legal issues."[5]

11. During the period July, 2017 to January 17, 2018, LegalEase accessed Westlaw® information valued in the millions. LegalEase was able to access this volume of information in such a short period of time by engaging in conduct that is expressly prohibited in its Subscription Agreement with West.

## PARTIES

12. West Publishing Corporation is a citizen of Minnesota, is a Minnesota corporation, and has its principal place of business at 610 Opperman Drive, Eagan, Minnesota 55123. West is a wholly-owned subsidiary of Thomson Reuters (Legal) Inc., a Minnesota corporation.

13. Defendant LegalEase Solutions, LLC is a citizen of Michigan, is a Michigan limited liability company, and has its principal place of business at 2301 Platt Road, Suite 20, Ann Arbor, Michigan 48104.

## JURISDICTION AND VENUE

14. Jurisdiction is proper under 28 U.S.C. §§ 1332(a) and (c) because there is complete diversity of citizenship between West and LegalEase and the amount in controversy exceeds $75,000.

---

[5] *See https://legalresearch.uslegal.com/LegalEase/* (last accessed on May 25, 2018).

15. This Court has personal jurisdiction over LegalEase, as LegalEase has significant contacts with, derives value from, and transacts and does business in the District.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because West resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

17. Venue is also proper in this District because the express terms of the parties' Subscription Agreement at issue state that any claim "may be brought in the state or federal courts in Minnesota."

## FACTUAL BACKGROUND

### West's Westlaw® Products and Services

18. Westlaw® is an online legal research platform offered to subscribers by West, which is a subsidiary of Thomson Reuters (Legal) Inc.

19. Westlaw® offers to subscribers access to a comprehensive collection of legal information, backed by a rigorous editorial process; editorial enhancements such as proprietary headnotes, notes of decisions, and the West Key Number System; technological innovation from its WestSearch® and Research Recommendations tools that provide subscribers with cutting-edge technology and a competitive edge; dedicated attorney-editors, who are bar-admitted, to track legal changes every day, so that its subscribers can trust the accuracy and timeliness of the information that is offered; access to on-demand legal research support to help subscribers; and the KeyCite® citation

service to ensure that subscribers cite good law with the industry's most accurate, up-to-the-minute citation service.

20. Westlaw®'s platform includes access to volumes of proprietary material, databases, and compilations of case law, state and federal statutes, state and federal regulations, law journals, treatises, and other resources. Westlaw® incorporates decades of search and editorial intelligence with the latest technological innovations.

21. Integral to the Westlaw® platform is the proprietary organizational system referred to as the "West Key Number System".

22. West has created the West Key Number System, beginning over 100 years ago. Initially developed in printed digest format, the West Key Number System has been continually updated and digitally transformed onto the online Westlaw® research platform. The development of the West Key Number System, both in print and digital formats, has been and continues to be the result of a substantial investment of time, resources, and editorial choices made by West over decades.

23. The West Key Number System works as a master classification system through which West's attorney-editors organize cases by corresponding legal issues and topics.

24. The West Key Number System adds significant value to the Westlaw® product. It has also helped position West as a leader in the legal research sector.

25. West's original and revised text and compilation of legal material made available through Westlaw®, including the West Key Number System and

headnote system, has independent economic value. West has invested hundreds of millions of dollars in Westlaw® and takes measures, such as those limitations set forth in the parties' agreements, to protect the proprietary nature of Westlaw® information, including its West Key Number System and headnote system.

Relationship Between West and LegalEase

26. Upon information and belief, LegalEase provides legal research and writing services to law firms and corporate counsel across the United States, and this work involves drafting research memorandums for customers on various legal topics.

27. LegalEase historically used Westlaw® to carry out its services on behalf of its customers.

28. LegalEase first contracted with West to obtain a limited license to Westlaw® in 2008.

29. LegalEase, acting through its President and Co-Founder Tariq Hafeez, renewed its Subscription Agreement for Westlaw® most recently on October 4, 2017.

30. The terms of LegalEase's agreement with West are set forth in a product Order Form, which expressly incorporates the Thomson Reuters Legal Products and Professional Services General Terms and Conditions (the "Terms and Conditions"). Collectively, the Order Form and the Terms and Conditions (and the earlier iterations of the order forms and terms and conditions, which previously were titled Research Subscriber Agreements) establish the contract terms between LegalEase and West, which is referred to herein as LegalEase's "Subscription Agreement."

31. At all times during LegalEase's relationship with West, LegalEase had a Subscription Agreement in place that governed the terms of the limited license granted by West. The various iterations of the Subscription Agreement were substantively consistent during the time periods relevant to West's claims.

32. The Order Forms set forth the specific product or product bundles licensed by LegalEase, including any additional or custom products; the minimum term of the order; the monthly charges; and the individual users who are authorized to access the Westlaw® research platform.

33. Under the Subscription Agreement, LegalEase was granted a limited license to access Westlaw®'s information, including editorially enhanced case law, statutes, and regulations, and major secondary publications, in exchange for paying a monthly fee of less than $5,000. LegalEase accepted this Order Form and was charged its monthly subscription fee until January 4, 2018, at which time West terminated LegalEase's access to Westlaw®.

34. The Terms and Conditions govern LegalEase's use of Westlaw®. Throughout the entirety of the parties' relationship, West granted to LegalEase "a non-exclusive, non-transferable, limited license to [LegalEase] to use the product in [their] ordering document in the regular course of [LegalEase's] business." West expressly "maintain[s] all rights of ownership to [its] products."

35. LegalEase's use of Westlaw® was expressly restricted in a number of ways, including by the following terms of the Subscription Agreement:

> Section 1(d). You may not sell, sublicense, distributed, display, store or transfer our product or any data in our

> products in bulk or in any way that could be used to replace or substitute for our products in whole or in part or as a component of any material offered for sale, license or distribution to the third parties. You may not use any means to discern the source code of our products.
>
> Section 1(e). Your access to certain products is password protected. You are responsible for assigning the passwords and maintaining password security. Sharing passwords is strictly prohibited.
>
> Section 1(f). You may not run or install any computer software or hardware on our products or network or introduce any spyware, malware, viruses, Trojan horses, backdoors or other software exploits.

36. The Subscription Agreement maintained the confidentiality and proprietary nature of Westlaw® by including a:

   a. Strict prohibition from sharing Westlaw® passwords;

   b. Strict prohibition from selling, sublicensing, distributing, displaying, storing or transferring West information in bulk or in any way that could be used to replace or substitute West products in whole or in part or as a component of any material offered for sale, license or distribution to third parties; and

   c. Strict prohibition from running or installing any computer software or hardware on West products or networks or introducing any other software or technical exploits.

37. Section 12 of the Terms and Conditions provides that LegalEase "may not assign the agreement to anyone else without our prior written consent."

38. Section 10 of the Terms and Conditions grants West the discretion to suspend or limit LegalEase's access to Westlaw® in the event LegalEase materially breaches its obligations under the Subscription Agreement. Pursuant to the express terms of Section 10(f) of the Terms and Conditions, all licenses granted by West to LegalEase ended immediately upon West's termination of the Subscription Agreement.

39. By letter dated January 4, 2018, West terminated LegalEase's Subscription Agreement due to material breach and violation of the Subscription Agreement. The effective date of West's termination was January 17, 2018. As such, LegalEase's limited license to Westlaw® terminated on January 17, 2018.

<u>LegalEase Materially Violated the Subscription Agreement</u>

40. During most of LegalEase's approximately nine-year license agreement with West, LegalEase maintained a generally consistent number of monthly Westlaw® transactions. On average, during the period January, 2013 to June, 2017, LegalEase conducted approximately 6,000 Westlaw® transactions per month.

41. During the period January, 2017 to January, 2018, LegalEase was charged approximately $60,000 pursuant to the Subscription Agreement, which includes its monthly charge as well as fees in connection with LegalEase's access to Westlaw® information that was not included in LegalEase's limited license.

42. Beginning in July, 2017, LegalEase's Westlaw® usage increased dramatically. LegalEase's monthly transactions peaked in November, 2017 at 236,000 transactions within a single month. In comparison, the average "AmLaw 100" law firm averages 52,000 Westlaw® transactions per month. See Figure A.

Figure A - LegalEase's Westlaw® Usage



43.     This inexplicable and sudden increase in monthly transactions prompted West to examine LegalEase's Westlaw® usage in greater detail.

44.     Between 2008 and 2015, LegalEase had licensed between two and eight Westlaw® passwords pursuant to the Subscription Agreement.  In August, 2017, LegalEase expanded its limited license to 20 Westlaw® passwords.  In September, 2017, LegalEase expanded its limited license to 40 Westlaw® passwords.  In October, 2017, LegalEase expanded its limited license to 50 Westlaw® passwords.

45.     Despite this increase in the number of passwords, LegalEase engaged in sharing Westlaw® passwords in violation of the Subscription Agreement.  Although West had warned LegalEase about this prohibited activity, LegalEase did not stop this improper practice of password sharing.

46.     Certain LegalEase passwords were used in October, November, and December of 2017 to access large amounts of Westlaw® information, and, at times, certain users accessed Westlaw® information for longer than 24 hours in a single session.  Exemplary information is below in Figure B.

11

Figure B – LegalEase's Westlaw® Usage for Particular Users

| User | Month | Avg. Hours per Business Day | Longest Access Hrs/Day |
|---|---|---|---|
| User A | 10/2017 | 9.97 | 19.34 |
| User B | 10/2017 | 9.49 | 22.85 |
| User C | 10/2017 | 11.67 | 23.87 |
| User D | 11/2017 | 17.23 | 22.47 |
| User E | 11/2017 | 15.32 | 21.97 |
| User F | 11/2017 | 18.48 | 33.87 |
| User G | 12/1-15/2017 | 17.63 | 27.95 |
| User H | 12/1-15/2017 | 16.08 | 23.66 |
| User I | 12/1-15/2017 | 18.17 | 23.22 |

Upon information and belief, Westlaw® usage for certain days by, at least, Users A–I (above), was possible only through the sharing of passwords between individuals or concurrent usage by an automated process, machine, software, or "bot." Through these Westlaw® sessions alone, LegalEase accessed substantially more than $75,000 of Westlaw® information.

47.  Upon information and belief, LegalEase's usage patterns from July, 2017 through January 4, 2018 are also indicative of the use of computer software or a "bot" to access Westlaw® information, in violation of the Subscription Agreement. Further, upon information and belief, this Westlaw® information was bulk "scraped" by LegalEase, in violation of the Subscription Agreement.

48.  For example, between October 1, 2017 and November 21, 2017, the user named "LegalEase8" accessed more than 8,200 Westlaw® documents. "LegalEase8's" access to each document lasted for less than 30 seconds; no document

was accessed using Westlaw®'s Search feature; no documents were printed, downloaded, or e-mailed using Westlaw®'s features for doing so.

49. Upon information and belief, "LegalEase8's" activity cannot be performed by a single human password holder and indicates that computer software, an automated process or machine, or a "bot" was utilized to access protected and proprietary Westlaw® information. For example, for six of "LegalEase8's" Westlaw® sessions:

  a. Each Westlaw® session lasted between two and a half hours and approximately four hours;

  b. Each Westlaw® session involved the viewing of approximately 1,000 documents, with the fewest number of views being 916 documents and the highest number of views being 1,490 documents;

  c. During each Westlaw® session, each document was accessed for only approximately 10 seconds at a time; and

  d. None of its Westlaw® sessions resulted in the printing or downloading of a single document.

See Figure C.

Figure C – "LegalEase8" Sessions

| Details | 10/30/17 | 11/2/17 | 11/3/17 (1) | 11/3/17 (2) | 11/5/17 | 11/15/17 |
|---|---|---|---|---|---|---|
| Duration (hrs:min) | 2:50 | 3:15 | 3:12 | 4:01 | 2:47 | 4:16 |
| # of Doc Views | 1,042 | 1,150 | 1,150 | 1,490 | 916 | 1,352 |
| Average Doc View Length | ~10 secs | ~10 secs | ~10 secs | ~10 secs | ~10 secs | ~10 secs |
| Downloads | 0 | 0 | 0 | 0 | 0 | 0 |
| Prints | 0 | 0 | 0 | 0 | 0 | 0 |

Exact same document view sequence in both sessions

50.     The activity in each of these six sessions followed an identical or a consistent pattern. Specifically, in these sessions, "LegalEase8" first browsed to Westlaw®'s West Key Numbers. Next, "LegalEase8" selected a Key Number of interest. "LegalEase8" then selected a West Key Number sub-section of interest. Finally, "LegalEase8" would run a search for all cases in that West Key Number sub-section without using any search terms.

51.     LegalEase8" would then view the West Key Number search results in an identical pattern, including viewing a case in the results list, then viewing each document cited in the paragraph of the case associated with the searched key number sub-section, the list of cases citing the headnote associated with the searched key number sub-section, and the first twenty cases in that list of cases. "LegalEase8" would then repeat the process for the next case in the results list.

52. Upon information and belief, based on the characteristics of these exemplary sessions identified in Figures B and C -- including, the length of the sessions, with some being longer than 24 hours at a time, the high number of documents viewed, the limited viewing time of each document, the same pattern of usage, and the failure to download or print a single document -- LegalEase employed computer software, a "bot," or some other automated electronic method or browser plug-in to rapidly access Westlaw®'s information, and simultaneously scrape, copy, or otherwise store the Westlaw® information accessed.

53. LegalEase's password sharing directly and materially violated the Subscription Agreement, including, but not limited to, Section 1 of the Terms and Conditions.

54. As a result of LegalEase's actions, West sent LegalEase's President and Co-Founder Tariq Hafeez a letter on January 4, 2018 terminating the Subscription Agreement, which was effective on January 17, 2018.

55. LegalEase has not denied materially breaching the Subscription Agreement.

56. Upon information and belief, LegalEase was copying, storing, and then transferring and/or selling West's information, which had been accessed and acquired in violation of the Subscription Agreement, to its machine learning customer for use in developing another legal research product. The Subscription Agreement expressly restricts LegalEase from selling, sublicensing, distributing, displaying, storing, or transferring Westlaw® material.

57. Upon information and belief, LegalEase and its machine-learning customer continue to possess and store Westlaw® information that LegalEase acquired in violation of the Subscription Agreement.

## COUNT I
(Breach of Contract)

58. Plaintiff repeats and realleges the allegations of paragraphs 1 through 57 as though fully set forth herein.

59. The Subscription Agreement, consisting of the West ProFlex Order Form and the Terms and Conditions (and all prior iterations of said order forms and terms and conditions), which are incorporated by reference therein, is a valid and binding contract.

60. West fully performed its obligations under the Subscription Agreement.

61. LegalEase breached the Subscription Agreement by, at least:

   a. sharing passwords with unauthorized users; and

   b. utilizing an automated method or browser plug-in to scrape Westlaw® information, including in bulk.

62. LegalEase continues to possess, store, and otherwise have access to Westlaw® material that it acquired in violation of the Subscription Agreement.

63. As a direct and proximate cause of LegalEase's breach, West has suffered, and will continue to suffer, damages in an amount to be determined at trial, including, but not limited to, LegalEase's violative access of Westlaw® and Westlaw® information valued in the millions.

64. As a result of LegalEase's breach, West is entitled to injunctive relief enjoining LegalEase from accessing, using, storing, selling, or transferring any information that it acquired from Westlaw® in violation of the Subscription Agreement.

65. West is further entitled to specific performance of the Subscription Agreement.

## JURY DEMAND

West requests a jury on all claims triable by jury.

WHEREFORE, Plaintiff respectfully requests that this Court:

i. Enter judgment in favor of West and against LegalEase on West's claims;

ii. Award damages to West in an amount to be determined at trial against LegalEase;

iii. Permanently enjoin LegalEase from accessing, using, selling, or transferring any information that it acquired from Westlaw® in violation of the Subscription Agreement;

iv. Award West reasonable attorneys' fees and costs against LegalEase; and

v. Award such other relief as the Court deems just and proper.

Dated:  May 25, 2018

Scott T. Lashway (pro hac vice
   application to be filed)
Benjamin A. Stern (pro hac vice
   application to be filed)
Holland & Knight LLP
10 Saint James Avenue
Boston, MA 02116
(617) 523-2700
Scott.Lashway@hklaw.com
Benjamin.Stern@hklaw.com

Respectfully submitted,

s/Lora Mitchell Friedemann
Lora Mitchell Friedemann (#0259615)
Fredrikson & Byron, P.A.
200 South Sixth Street, Ste. 4000
Minneapolis, MN 55402
(612) 492-7185
lfriedemann@fredlaw.com

Attorneys for West Publishing Corporation

64072363.1