## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---------------------------------------------------------------------

x

WEST PUBLISHING CORPORATION,    :

      Plaintiff / Counterclaim-
      Defendant,    :

  v.    :

LEGALEASE SOLUTIONS, LLC,    :

      Defendant /Counterclaim-
      Plaintiff.    :

    :

---------------------------------------------------------------------

x

Civ. No. 18-CV-01445
(DSD/ECW)

## PLAINTIFF AND COUNTERCLAIM-DEFENDANT
## WEST PUBLISHING CORPORATION'S MEMORANDUM
## OF LAW IN SUPPORT OF MOTION TO COMPEL PRODUCTION
## OF DOCUMENTS IN RESPONSE TO SUBPOENA *DUCES TECUM*

### INTRODUCTION

In its subpoena *duces tecum* issued to third-party ROSS Intelligence, Inc.

("ROSS") on June 14, 2019 (the "Subpoena," Exhibit A), Plaintiff and Counterclaim-

Defendant West Publishing Corporation ("West") requested four categories of documents

relevant to its claims, defenses, and relief sought in the above-captioned litigation:

> (1) Documents and communications with LegalEase Solutions, LLC
> ("LegalEase"), its affiliates, and its contractors, including but not limited to,
> Morae Global, Clutch Group, Kelly Services, and LegalEase India;
> (2) Documents and communications concerning LegalEase's provision (either
> directly or indirectly) of Westlaw information and information derived therefrom
> to ROSS;
> (3) Documents and communications concerning ROSS's relationship and dealings
> with LegalEase; and
> (4) Documents and communications concerning ROSS's agreements with
> LegalEase pursuant to which LegalEase performed services or provided goods to
> ROSS.

(*See* Exhibit A).

Despite West's relevant requests, ROSS delayed its production of documents for several months while promising that it was gathering certain categories of documents for production pursuant to its written objections.  Counsel for West had agreed in the first instance to consider ROSS's production rather than moving the Court for immediate relief.  While ROSS has delayed West's consideration of moving the Court for some time as it repeatedly promised additional productions, ROSS's production to-date and their commitment to comply with the Subpoena have fallen short of their obligations.  Further, ROSS still has failed to provide West with the information necessary for West to assess the completeness of ROSS's production.  The information ROSS has provided, however, indicates significant deficiencies in the scope and breadth of ROSS's collections. Further, ROSS's privilege log and redaction log shows that ROSS withheld a substantial amount of information under the guise of privilege where none in fact exists.

Therefore, pursuant to Rule 45(d) of the Federal Rules of Civil Procedure, West respectfully requests that the Court order ROSS to produce the documents requested in the Subpoena in whatever form those documents exist, including, but not limited to, communications existing in the Slack messaging application used by ROSS employees. West also requests that the Court order ROSS to produce the communications improperly withheld or redacted as privileged, or, in the alternative, conduct an in camera review of the documents over which ROSS has claimed privilege to assess the legitimacy of ROSS's claim.  While West and ROSS continue to work towards a resolution of this dispute, the impending fact discovery deadline, currently set for September 30, 2019,

necessitates that West move to compel production of these documents in order to
preserve its rights to discovery essential to this case.

## FACTUAL BACKGROUND[1]

West currently is engaged in the above-captioned litigation (the "Litigation")
against LegalEase Solutions, LLC ("LegalEase").  In the Litigation, West alleges that
LegalEase improperly accessed Westlaw and used an automated tool or "bot" to scrape
Westlaw data in violation of LegalEase's subscription agreement, and that LegalEase
provided this data to a machine-learning client for the machine-learning client's use in
training its own legal research platform.[2]  (*See* Dkt. 1).  ROSS is that machine-learning
client.  West is defending LegalEase's counterclaim that West improperly terminated
LegalEase's access to Westlaw®.

From the outset, West struggled to obtain necessary discovery from LegalEase.
Twice, West was forced to extend the discovery deadline, which the parties jointly agreed
to in the first instance to provide for expedited fact discovery, as a result of LegalEase's
dilatory tactics.  (*See* Dkt. 30 and Dkt. 49).  West also had to avail itself of this Court's
informal dispute resolution process to compel LegalEase to produce basic discovery
sought by West.  (*See* Dkt. 36).  Among the many issues with LegalEase's discovery
responses was its failure to produce all of the documents responsive to West's requests

---

[1]  The Exhibits referenced in this memorandum are attached to the Declaration of Scott T.
Lashway.

[2]  In its Complaint, West seeks not only monetary, but also injunctive relief.
Accordingly, West is entitled to understand the full extent to which LegalEase provided
to third parties, including ROSS, any information or materials taken or derived from
Westlaw in violation of LegalEase's contractual obligations with West.

for production of documents.  (*See id.*).  For example, to-date, LegalEase still has not

fully produced the thousands of "answer files" LegalEase created for ROSS, which West

believes is confirmed by ROSS's production to-date.  West has sought these memos from

ROSS, and ROSS has produced at least some of the memos in a format purportedly

received from LegalEase, but that LegalEase never produced to West.  LegalEase's

continued failure to comply with its discovery obligations necessitated West to seek

discovery from ROSS directly.  LegalEase's failings also required West to patiently work

with Ross to secure its production, which presents core evidence to West's claims and

defenses.

ROSS accepted service of the Subpoena on June 20, 2019.  After preliminary

email correspondence regarding the response date, ROSS sent to West a letter objecting

to the Subpoena on June 28, 2019 (the "June 28 Letter," Exhibit B).  The June 28 Letter

set forth nine general objections and then specifically objected to each of the four

categories of documents requested in the Subpoena, with the caveat that subject to the

objections, ROSS was willing to produce documents in response to Request Nos. 2 and 4.

On two initial meet and confers, July 11 and July 15, 2019, between counsel for

ROSS and West, ROSS committed to producing four categories of documents:  (1)

contracts and agreements between ROSS and LegalEase, including the master services

agreement and any corresponding statements of work, regardless of time period; (2) the

"ROSS Classifier Data Set," consisting of the documents and information created in

connection with work that Ross and/or LegalEase has referred to as the "ROSS classifier

project;"  (3) the "LPO Data Set," consisting of the thousands of memorandums that

LegalEase, and possibly other third-parties working at LegalEase's direction, transferred to ROSS; and (4) emails collected from ROSS employees who were involved, directly or indirectly, with Ross's work with LegalEase. This would include external communications with LegalEase as well as internal communications concerning LegalEase or its work.

West and ROSS also discussed the issue of relevant communications in ROSS's possession existing within the messaging application called Slack. ROSS indicated that it was willing to produce these communications provided that West would agree to contribute to certain of the associated costs. ROSS was unable to identify the costs at that time, but committed to providing an estimate to West on a timely basis.

West received ROSS's first production of documents, consisting of approximately 11,512 documents, on July 25, 2019. ROSS's production consisted primarily of agreements between ROSS and LegalEase; emails between ROSS and LegalEase; "answer files" and material provided by LegalEase to ROSS; and copies of Westlaw cases provided by LegalEase to ROSS. Not included were any internal ROSS communications regarding LegalEase or its work for LegalEase. At the time, ROSS did not indicate whether or when West could anticipate receiving additional categories of documents.

On August 12, 2019, following a hurried assessment of ROSS's initial production, West sent to ROSS a letter outlining West's understanding of ROSS's commitments regarding its document production, inquiring into the status of the documents ROSS committed to producing, and seeking additional information related to the Slack

communications ROSS previously raised (the "August 12 Letter," Exhibit C).

Specifically, West *again* requested that ROSS provide West with the costs of collecting

and producing the responsive Slack communications so that West could assess potentially

contributing to the costs.

In an August 14 email (Exhibit D), in anticipation of a subsequent call between

counsel to discuss the August 12 Letter, ROSS purported to answer the questions raised

in the August 12 Letter.  This email included the search terms ROSS used to identify

responsive documents, as well as the custodians against whose files the search terms were

executed.  On that same day, ROSS made its second production of documents.  ROSS's

second production did not contain internal ROSS communications and appeared to

continue to be limited in scope.

On August 20, ROSS and West again met and conferred by telephone to discuss

(1) the completeness of ROSS's productions to-date; (2) the status of ROSS's intended

production of internal ROSS communications; and (3) an estimate of the cost to produce

Slack communications.  While ROSS indicated that with the exception of internal ROSS

communications, its production was substantially complete, West asked ROSS to

investigate this claim further given that West knew of at least one category of documents

– the memorandums – that ROSS has not fully produced.  ROSS also committed to

producing the internal ROSS communications by the end of August.  With respect to

Slack communications, ROSS provided a general estimate for collection costs, but

provided no additional information as to the costs for review or production.  ROSS

6

sought West's agreement to contribute to the costs, but without greater clarity as to the anticipated amount, West made clear it could make no such commitment.

On September 3, having not received any additional documents or communications from ROSS, West inquired by email on the status of the internal communications production and requested again that ROSS provide a sum certain for the cost of producing the Slack communications. ROSS did not respond. On September 6, after additional follow up from West, ROSS replied, indicating that ROSS's final production of ROSS emails, including internal communications, was forthcoming. ROSS also indicated that the answer files and material that West sought had been produced in .json format in an earlier production, but that ROSS was working to produce the memos in Word. This followed a conversation during which West's counsel raised questions as to the scope of Ross's production as it did not include the approximately 27,000 answer files. ROSS again failed to provide West with any certainty as to the cost of producing Slack communications.

On September 7, West received ROSS's third production of documents, consisting of approximately 939 internal ROSS email communications, many of which were redacted. West received ROSS's fourth production on September 10. It consisted of approximately 26,152 documents. These documents appear to be the Word versions of the memos requested by West.

The next day, September 8, West received ROSS's privilege log (Exhibit E) and redaction log (Exhibit F). ROSS withheld 340 documents and redacted portions of 85 others on the basis that the communications were privileged communications between

ROSS and ROSS employee Tomas Van Der Heijden ("Heijden") or protected work product. At ROSS, Heijden appears to have held such positions as "Head of Legal Research" and "Legal, Data & Content Lead." According to his LinkedIn page, Heijden describes himself as "Head of Legal & Product." (Exhibit G). Based on the documents produced to-date, Heijden appears to have served as the primary point of contact between ROSS and LegalEase. Heijden's purported attorney role is not apparent and there is nothing in the record to support a conclusion that he represented himself as acting in the capacity of ROSS's legal counsel. Heijden, who it is believed worked from ROSS's offices in California, is not a U.S. licensed attorney.

On September 13, West and ROSS again met and conferred on the matter of the completeness of ROSS's productions and production of the Slack communications, including West's request for the associated costs to produce the Slack communications. Counsel for West also inquired as to whether ROSS would revisit its assertion of privilege over communications involving Heijden, who up until that time, West understood to be the primary project manager with whom LegalEase communicated. Failing to resolve the outstanding issues, counsel scheduled a subsequent call for September 16, in hopes that ROSS would have additional information about the efforts to collect the Slack communications and the costs associated therewith. Counsel spoke on September 16, but ROSS was unable to provide any greater clarity.

On September 16, ROSS's counsel indicated by email that it had produced the following categories of documents:

- Exported data from ROSS's relevant databases (the .json files)
- Westlaw cases provided to ROSS by LegalEase.  After receiving the cases produced, ROSS informed LegalEase that it did not want to receive Westlaw cases
- Word versions of memos, to the extent provided to ROSS in that format
- Emails from the custodians listed below, who are custodians we identified as having contact with LegalEase, according to the following process:
  - All emails with a LegalEase email address in the metadata were produced.
  - For emails without a LegalEase email address in the metadata, we applied the search terms listed below, excluding the Westlaw term because we determined it generated a large volume of false hits and responsive content hit on one of our other search terms, to the parent emails.  We then reviewed all documents with hits, and their family members, for responsiveness and privilege, and produced non-privileged documents responsive to the subpoena requests.  Partially-privileged documents were redacted and produced.
  - The contracts with LegalEase are included in this email production.

(*See* Exhibit H).

Still, at this time, ROSS has failed to satisfy West's concerns regarding the completeness of ROSS's productions.  Further, ROSS's unwillingness to provide timely to West any commitment to produce relevant communications or cost certainty of producing the Slack communications has prevented West from obtaining discovery crucial to the Litigation in a timely manner.[3]  As of today, ROSS has not sought any relief from its obligations to fully comply with the Subpoena.

---

[3] ROSS's most recent correspondence illustrates its delay in responding and its unwillingness to engage with West in a meaningful manner to satisfy its obligations under the Subpoena.  On July 15, 2019, ROSS reported during a meet and confer that the anticipated costs for collecting and producing relevant Slack communications for its nine custodians far outweighed a third-party's obligations.  As such, West offered to consider cost shifting if ROSS would provide certainty as to those technical costs.  Notwithstanding West's repeated requests for the anticipated amount in concern, ROSS failed to provide any cost certainty and only generically represented that it would be more than ten thousand dollars.  On September 20, 2019, after West informed ROSS that it would be moving the Court to compel production and compliance with the subpoena, ROSS provided by email that it estimated that the cost of converting the Slack messages into a searchable format for production would be $3000–$4000.  ROSS still did not provide an estimate as to the cost for reviewing and producing the Slack messages once converted.  Due to its delay and failure to seek any protection, ROSS should be required to efficiently search for and produce relevant Slack communications immediately.

## LEGAL STANDARD

"Pursuant to a subpoena, a non-party can be compelled to produce evidence regarding any matter relevant to the claim or defense of any party, unless a privilege applies." *United States v. R.J. Zavoral & Sons, Inc.*, No. 12-CV-668 (MJD/LIB), 2014 WL 12756820, at *3 (D. Minn. Jan. 17, 2014); *Keefe v. City of Minneapolis*, No. CIV. 09-2941 DSD/SER, 2012 WL 7766299, at *3 (D. Minn. May 25, 2012). Relevancy is governed by Fed. R. Civ. P. 26(b)(1), regardless of whether the discovery is sought from a party or non-party. *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-CV-3065 (JRT/HB), 2017 WL 7369890, at *3 (D. Minn. Feb. 13, 2017). Under Rule 26(b)(1), relevancy is broadly construed, but the discovery sought still must be proportional to the needs of the case. *See id.* at *4; Fed. R. Civ. P. 26(b)(1) (including as factors relevant to proportionality "the issues at stake in the action… the parties' relative access to relevant information… [and] the importance of the discovery in resolving the issues."). While parties must not impose an undue burden on non-parties from whom discovery is sought, it is the burden of the party resisting production to show either a "lack of relevancy or undue burden." *Scheffler v. Molin*, No. CIV. 11-3279 JNE/JJK, 2012 WL 3292894, at *6 (D. Minn. Aug. 10, 2012). If a non-party fails to comply with a valid subpoena, Fed. R. Civ. P. 45(d)(2)(B)(i) provides that a party may "move the court in the district where compliance is required for an order compelling production or inspection."[4]

---

[4] The parties have agreed for purposes of the Subpoena to treat the place of compliance as Minnesota. (*See* Exhibit B).

## ARGUMENT

I.    **ROSS HAS FAILED TO ESTABLISH ANY LEGITIMATE
      BASIS FOR ITS FAILURE TO COMPLY WITH THE SUBPOENA.**

As discussed further below, ROSS has failed to demonstrate a lack of relevancy or an undue burden in complying with the Subpoena's limited requests, which are relevant and proportional to the needs of the case.  *Unitherm Food Sys., Inc. v. Hormel Foods Corp.*, No. CV 14-4034 (JNE/BRT), 2015 WL 13021799, at *1 (D. Minn. Nov. 13, 2015) (finding that the party seeking discovery must make a threshold showing of relevancy, after which the burden rests with the party resisting discovery).  Thus, ROSS must comply with the Subpoena and produce the documents or communications requested therein.

### a.    ROSS Must Produce Documents Responsive to Request No. 1.

West requested that ROSS produce "*[a]ny and all documents and communications with LegalEase, its affiliates, and its contractors, including but not limited to, Morae Global, Clutch Group, Kelly Services, and LegalEase India.*"  (Exhibit A).

The relevancy of these documents is readily apparent.  According to LegalEase, it contracted with these entities to perform services for ROSS, including providing material to ROSS that West believes contains information taken directly from Westlaw in violation of LegalEase's subscription agreement.  Thus, the extent to which ROSS was aware of, communicated with, or received materials from Morae Global, Clutch Group, Kelly Services, and LegalEase India bears directly on the claims and defenses in the Litigation.

In its June 28 Letter, ROSS objected to Request No. 1, stating that "the Company has not discovered any knowledge of Morae Global, Clutch Group, or Kelly Services, much less communications with those entities." (Exhibit B). ROSS failed however to identify any basis for this assertion. ROSS did not articulate what, if any, work ROSS undertook to make this determination, including with whom ROSS communicated or how ROSS searched for any relevant communications. As ROSS's August 14, 2019 email shows, it did not use Morae Global, Clutch Group, Kelly Services, or LegalEase India as search terms. (Exhibit D). Thus, how ROSS can assert that it has not "discovered" any communications with those entities is unclear.

Further, ROSS did not object to Request No. 1 on the basis that information was irrelevant or unduly burdensome. *Unitherm Food Sys., Inc.*, 2015 WL 13021799, at \*1 ("The party resisting production bears the burden of establish lack of relevancy or undue burden.") (internal quotations and citations omitted). Thus, ROSS should be compelled to search for and produce any documents responsive to Request No. 1.

### b. ROSS Must Produce Documents Responsive to Request No. 2.

West requested that ROSS produce "*[a]ny and all documents and communications concerning LegalEase's provision (either directly or indirectly) of Westlaw information and information derived therefrom to ROSS, including but not limited to headnotes, notes of decision, and the West Key Number system.*" (Exhibit A).

The information requested bears directly on the allegations in West's Complaint, including that LegalEase breached its subscription agreement by "utilizing an automated method or browser plug-in to scrape West information, including in bulk." (*See* Dkt. 1, ¶

61).  Given that ROSS received the material from LegalEase, ROSS is uniquely situated to be able to provide West with documents relevant to LegalEase's violative conduct. *See* Fed. R. Civ. P. 26(b)(1) (citing as a factor in proportionality "the parties' relative access to relevant information").

ROSS agreed to produce documents responsive to Request No. 2 subject to ROSS's general objection as to relevancy.  Given that Request No. 2 seeks exactly those documents that would support West's claims that LegalEase scraped Westlaw data and provided it to a third-party, ROSS's objection rings hollow.  Further, the record in this case makes clear that West has met with significant resistance from LegalEase in obtaining relevant discovery.  Therefore, West's need to obtain relevant documents and communications from the exact third-party to whom LegalEase provided the data taken from West is both legitimate and appropriate.

Despite ROSS's agreement to produce relevant documents, West has been unable to determine the extent to which ROSS complied with this request.  Of the documents ROSS committed to producing, none explicitly fulfill ROSS's obligation to produce documents responsive to Request No. 2.  (*See* Exhibit C).  And ROSS's exclusion of "Westlaw," for example, from its search terms indicates a high likelihood that relevant documents have been withheld.  (*See* Exhibit D).   Thus, ROSS should be compelled to collect and produce any documents responsive to Request No. 2.

13

### c. ROSS Must Produce
### Documents Responsive to Requests No. 3 and 4.

West requested that ROSS produce "*[a]ny and all documents and communications*

*concerning ROSS's relationship and dealings with LegalEase*" and:

> [a]ny and all documents and communications concerning
> ROSS's agreements with LegalEase pursuant to which
> LegalEase performed services or provided goods to ROSS,
> including, but not limited to:   (i) the Master Services
> Agreement and Statement of Work between LegalEase on the
> one hand and ROSS on the other hand, dated October 15,
> 2015; (ii) the "Statement of Work II for ROSS Bulk Memos"
> entered into between LegalEase on the one hand and ROSS
> on the other hand dated September 15, 2017; (iii) the
> "Statement of Work for ROSS Variation" entered into
> between LegalEase on the one hand and ROSS on the other
> hand dated November 10, 2017; and (iv) the "Statement of
> Work for ROSS Classifier" entered into between LegalEase
> on the one hand and ROSS on the other hand dated December
> 26, 2017.

(Exhibit A).

LegalEase's business relationship with ROSS, including the genesis of the projects

that LegalEase's conducted on ROSS's behalf and the methods by which the work was to

be completed likely will provide West with direct of evidence of how and why LegalEase

undertook its violative conduct.  While West anticipated receiving many of these

documents from LegalEase directly, it has become apparent -- including through ROSS's

production of communications with LegalEase not previously produced by LegalEase --

that LegalEase has not met its discovery obligations, thus requiring West to resort to

obtaining the documents from a third-party.

At this time, however, West cannot be certain whether ROSS fully complied with its obligation to produce the requested documents and communications. ROSS did not communicate its search terms to West until after its initial production of documents. (Exhibit D). And it was not until after West had the opportunity to review the contents of ROSS's productions that it became clear how deficient ROSS's search terms were.[5] Other than the 10 names (with variations) that ROSS used as search terms, ROSS used only three other terms – (1) LegalEase; (2) Bulk; and (3) Classifier. Not included in the terms are any variations on the name LegalEase, the names of *all* of the projects for which ROSS and LegalEase contracted, any variations on the project names, or any other terms that may have been used frequently in referring to the various projects.

With respect to Request No. 3, ROSS objected to the request in its June 28 Letter as encompassed within Request Nos. 1 and 2. (Exhibit B). This objection, however, does not relieve ROSS of its obligations to produce responsive documents, as ROSS neither objected on the grounds of relevancy or on undue burden. *Scheffler*, 2012 WL 3292894, at *6. Further, Request No. 3 is a broader request than Request Nos. 1 and 2, and thus, while some documents produced in response to Request Nos. 1 and 2 may fall under Request No. 3, the converse is not necessarily true. With respect to Request No. 4, ROSS committed to producing responsive documents, but for the reasons already stated,

---

[5] While ROSS's June 28 Letter proposes that West identify terms to be employed in searching for responsive documents, West explained to ROSS that it was not in a position to know whom at ROSS was involved in the LegalEase project, nor did West know the terms that ROSS employees would have used internally in referring to the projects or work.

15

West cannot meaningfully assess at this time whether ROSS's production is complete -- the available evidence, though, suggests it is not.

###   d.   ROSS Must Include Slack Communications In Its Production of Documents Responsive to Request Nos. 1–4.

Regardless of the request in response to which ROSS is producing documents, ROSS must include any communications in its possession, custody or control held in Slack message format.  ROSS specifically indicated in its June 28 Letter that ROSS employees frequently communicated via the Slack messaging application.  (Exhibit B, ¶ 4).  ROSS asserts that this greatly increases the number of communications that ROSS must review, making ROSS's compliance "unduly burdensome and expensive."

ROSS's conclusory statement as to burden and expense is insufficient to excuse ROSS from its obligations under the Subpoena.  The mere assertion of boilerplate objections that discovery sought is overbroad or unduly burdensome without supporting the objection with some level of detail is insufficient to state a sustainable objection to discovery.  *See In re Nat'l Arbitration Forum Litig.*, 2010 WL 11469529 at *3 (D. Minn. Feb. 16, 2010).[6]  Further, unless responding to the requested discovery imposes a "significant expense," parties responding to a subpoena are typically "required to absorb the costs of responding to that subpoena."  *Paisley Park Enterprises, Inc. v. Boxill*, No.

---

[6]  Although the matter at issue here is non-party discovery, "subpoenas issued under Rule 45 are subject to the same 'constraints that apply to all of the other methods of formal discovery.'"  *Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 236 (D. Minn. 2013) (quoting *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 177 F.R.D. 443, 443 (D. Minn. 1997) (applying Fed. R. Civ. P. 26(a)(5) to Rule 45 subpoenas)).

17-CV-1212 (WMW/TNL), 2019 WL 1036059, at *5 (D. Minn. Mar. 5, 2019); *see also* Fed. R. Civ. P. 45(d)(2)(B)(ii).

Though under no obligation to do so, West repeatedly sought from ROSS an estimate regarding the cost of collecting, reviewing, and producing the Slack communications so that West could evaluate its ability to contribute to the process.  (*See* Exhibit C).  Over almost three months of communications, ROSS was unable or unwilling to satisfy West's request.  At most, ROSS explained that the cost of processing the Slack data would be at least $9,000 dollars, but the estimate did not include review and production costs.  (*See* Exhibit I).  Had the cost, in fact, been unduly burdensome to ROSS, ROSS certainly could have sought a protective order, which is has not done.

Without a more definite figure for which ROSS seeks contribution, West cannot commit to contributing any costs associated with the Slack communications.  Further, at this juncture, ROSS has not illustrated that the expense of collecting, reviewing, and producing the Slack communications is "significant," such that West should be obligated to contribute any amount.  *Paisley Park Enterprises, Inc.*, 2019 WL 1036059, at *5 (rejecting a request for payment of costs to comply with a subpoena where non-party provided no information showing that the cost of compliance was significant).  ROSS, therefore, must produce the Slack communications to the extent any communications exist responsive to Request Nos. 1–4.

II.     **ROSS'S ASSERTION OF PRIVILEGE**
        **AND WORK PRODUCT PROTECTION LACKS MERIT.**

   a.   **Communications with Heijden Cannot**
        **Be Privileged Because They Were Not Made**
        **During the Course of The Attorney-Client Privilege.**

As a matter of California law, to support a claim of attorney-client privilege, a communication must be made between a client and a lawyer in confidence during the course of the attorney-client relationship. *See Edwards Wildman Palmer LLP v. Superior Court*, 231 Cal. App. 4th 1214, 1224–26 (2014). Communications to a lawyer hired to perform non-legal work for a client are not made in the course of the attorney-client professional relationship and are not protected. *See Chicago Title Ins. Co. v. Superior Court*, 174 Cal. App. 3d 1142, 1151 (Ct. App. 1985); *Montebello Rose Co. v. Agric. Labor Relations Bd.*, 119 Cal. App. 3d 1, 31–32 (Ct. App. 1981). Based on discovery conducted to date, Heijden operated as a project manager for the various business ventures between ROSS and LegalEase. Nothing suggests that he provided legal advice to ROSS in that capacity.[7] Titles such as "Head of Legal Research" and "Legal, Data & Content Lead" are not indicative that the title-holder is an attorney, counsel at law, or other equivalent. Applying the attorney-client privilege and work product protections to communications between ROSS and Heijden would only unjustly reward ROSS for retaining an attorney to perform non-legal services, and would encourage others to retain lawyers simply to take advantage of the privilege. *See Chicago Title Ins. Co.*, 174 Cal. App. 3d at 1151; *Montebello Rose Co.*, 119 Cal. App. 3d at 31–32.

---

[7] Based on a review of Canadian records, it appears that Heijden is or was licensed to practice as an attorney in Ontario.

**b.  ROSS's Privilege Log Is Facially Deficient
Because It Does Not Enable West to Evaluate
ROSS's Claims Of Privilege and Work Product Protection.**

Rule 45 and Minnesota law require a person claiming privilege or protection to produce a privilege log that "describe[s] the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim."  Fed. R. Civ. P. 45(e)(2); *see Paisley Park Enterprises, Inc.*, 2019 WL 1036059, at *5 (holding that parties that have not produced a privilege log in connection with Rule 45 have not complied with Rule 45(e)(2) and have waived privilege).  In judging the adequacy of privilege logs under Rule 45, the same standards to those privilege logs required pursuant to Rule 26 apply.  *See Paisley Park Enterprises, Inc.*, 2019 WL 1036059, at *5.

Here, ROSS's privilege log does not sufficiently describe the nature of the withheld documents, the nature of the legal advice requested or provided, and the basis for asserting that Heijden carries privilege in California (or the U.S. for that matter) to enable West (or even the Court) to evaluate ROSS's claims of privilege and work product protection.  (*See* Exhibit E).  Privilege logs are facially deficient if they fail to identify whether named individuals are attorneys (so as to provide an understanding of the nature of the purported privilege and/or protection) and fail to meaningfully describe the scope of withheld documents.  *See, e.g.*, *Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. CV 14-3103 (SRN/FLN), 2015 WL 9861106, at *3 (D. Minn. Oct. 5, 2015), *objections overruled,* No. 14CV03103SRNFLN, 2016 WL 6774229 (D. Minn. Nov. 15, 2016) (finding privilege log facially deficient in respect of privileged claimed over individuals

19

without an identified attorney and with descriptions such as "Legal advice re license,"

"Legal advice re intellectual property," or "Legal advice re litigation").

ROSS's privilege log is similarly deficient. For example, ROSS's log includes an entry for an email between Andrew Arruda and Thomas Hamilton -- neither of whom are attorneys -- with the description, "Email chain seeking legal advice regarding completion of documents." (Exhibit E, Row 2). How this email chain, based on this description, is privileged, let alone what these "documents" concern, is unclear. *See Luminara Worldwide, LLC*, 2015 WL 9861106, at *3. In a similar entry, ROSS withheld an email between Arruda and Chris Errico -- again, neither of whom are attorneys -- with the description, "Email chain seeking legal advice regarding employee matters." (Exhibit E, Row 3). The privilege log is replete with examples of the exact types of descriptions that this Court has found to be facially inadequate. *See id*.

Even if ROSS's privilege log descriptions were facially adequate, it is not clear whether they accurately reflect the content of the withheld material and that such material is indeed privileged. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

20

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████        *See Chicago Title Ins. Co.*, 174 Cal. App. 3d at 1151; *Montebello*

*Rose Co.*, 119 Cal. App. 3d at 31–32.

In order to resolve these issues of ROSS's claims of privilege and work product

protection , the Court should order ROSS to submit the contents of its withheld material

for *in camera* review to allow the Court to evaluate the bases of ROSS's bald assertions.

When a privilege log is "insufficient to evaluate" whether the claims of privilege are

appropriate, a party may request that the Court "review the disputed materials in camera."

*Pemberton v. Republic Services, Inc.*, 308 F.R.D. 195, 199 (E.D. Mo. 2015).  However,

the party must have a basis for requesting the in camera inspection.  *See Ackerman v.*

*PNC Bank, Nat. Ass'n*, 2013 WL 9596080 at *15 (D. Minn. 2013) (denying a request for

in camera review because there was "no evidence in support of such an inspection other

than . . . speculation").  As described above, West bases this request on ROSS's

insufficient privilege log descriptions, as well as on ROSS's production of unredacted

documents almost identical to redacted documents that strongly suggest the redacted

material is not privileged.  This Court should order ROSS to disclose such materials.

## **CONCLUSION**

For the foregoing reasons, West requests that the Court grant its Motion To

Compel Production Of Documents In Response To Subpoena *Duces Tecum* and enter the

[Proposed] Order Compelling Production of Documents filed herewith.


Dated:   September 24, 2019

Lora Mitchell Friedemann (#0259615)
Fredrikson & Byron, P.A.
200 South Sixth Street
Suite 4000
Minneapolis, MN 55402
(612) 492-7185
*lfriedemann@fredlaw.com*

/s/ Scott T. Lashway
Scott T. Lashway (*pro hac vice*)
Mara A. O'Malley (*pro hac vice*)
Manatt, Phelps & Phillips, LLP
177 Huntington Avenue
Boston, Massachusetts 02115
(617) 646-1401
*SLashway@manatt.com*
*MOMalley@manatt.com*

***Attorneys for West Publishing
Corporation***

22