```
1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
2
     ------------------------------------------------------------
3                                     )
     West Publishing Corporation,     )  File No. 18-cv-1445
4                                     )            (DSD/ECW)
              Plaintiff,              )
5                                     )
     vs.                              )  St. Paul, Minnesota
6                                     )  October 16, 2019
     LegalEase Solutions, LLC,        )  10:04 a.m.
7                                     )
              Defendant.              )
8    ------------------------------------------------------------

9            BEFORE THE HONORABLE ELIZABETH COWAN WRIGHT
10            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (MOTION HEARING)
11

12

13

14

15

16

17

18

19

20

21

22

23

24
             Proceedings recorded by mechanical stenography;
25    transcript produced by computer.
```

```
 1      APPEARANCES

 2        For the Plaintiff:        Fredrikson & Byron
                                    LORA FRIEDEMANN, ESQ.
 3                                  Suite 4000
                                    200 South Sixth Street
 4                                  Minneapolis, Minnesota 55402

 5                                  Manatt, Phelps & Phillips, LLP
                                    SCOTT T. LASHWAY, ESQ.
 6                                  Suite 1700
                                    177 Huntington Avenue
 7                                  Boston, Massachusetts  02115

 8        For the Defendant:        Kutak Rock LLP
                                    AMANDA CEFALU, ESQ.
 9                                  60 South Sixth Street
                                    Suite 3400
10                                  Minneapolis, Minnesota 55402

11        For the Third Party       Dorsey & Whitney, LLP
          ROSS Intelligence,        PETER M. LANCASTER, ESQ.
12        Inc.:                     Suite 1500
                                    50 South Sixth Street
13                                  Minneapolis, Minnesota  55402

14        Court Reporter:           ERIN D. DROST, RMR-CRR
                                    Suite 146
15                                  316 North Robert Street
                                    St. Paul, Minnesota 55101
16

17

18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2                         **IN OPEN COURT**

3              THE COURT:  All right.  We are here today in the

4    matter of West Publishing Corporation v. LegalEase

5    Solutions, LLC, Case No. 18-cv-1445 DWF/ECW.  And we're here

6    on West's motion to compel production of documents from Ross

7    Intelligence, Inc., pursuant to a subpoena.

8              If counsel could make their appearances for the

9    record, beginning with counsel for West.

10             MS. FRIEDEMANN:  Good morning, Your Honor.  Lora

11   Friedemann for West Publishing Corporation, and with me is

12   Scott Lashway from Manatt, Phelps & Phillips, and

13   Mr. Lashway will present this morning.

14             THE COURT:  All right.  Thank you.  Good morning

15   to both of you.

16             MR. LASHWAY:  Good morning.

17             THE COURT:  And for LegalEase?

18             MS. CEFALU:  Your Honor, Amanda Cefalu from Kutak

19   Rock here on behalf of LegalEase.

20             THE COURT:  And do you plan on arguing today,

21   Ms. Cefalu?  Do you know yet?

22             MS. CEFALU:  I'm agreeing with the company.

23             THE COURT:  Okay.  So you will be arguing?

24             MS. CEFALU:  I will be arguing.  I will put our

25   position on the record.

1          THE COURT:  All right.  Thank you.

2          And for ROSS Intelligence?

3          MR. LANCASTER:  I'm Peter Lancaster for ROSS

4    Intelligence, and with me is Tomas Van Der Heijden whose

5    name is splashed across the papers.

6          THE COURT:  I noticed that.  All right.  Good

7    morning to both of you.  Thank you.

8          All right.  Well, this is West's motion, so I will

9    let you proceed, Mr. Lashway.

10         MR. LASHWAY:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. LASHWAY:  I'm going to keep my comments

13   relatively brief, and of course invite the Court to ask any

14   questions that I can answer to expedite your consideration

15   of our motion.

16         So, Your Honor, I know this is well-briefed, but

17   there seems to be some disagreement even as to the timeline

18   for why we're here in front of you.  As you may recall,

19   we've had discovery challenges as Plaintiffs in this case

20   for some time.  We've been in front of you on motions really

21   on an informal basis with LegalEase trying to obtain what we

22   view are core documents.  Our theories set forth in the

23   complaint have been borne true.  Our theory that LegalEase

24   was extrapolating Westlaw, copyrighted Westlaw, protected

25   data down and then using it to supply it to a company that

1   was seeking to be a competitor of ours has borne fruit.  We

2   haven't finished discovery yet, and we think we're permitted

3   to do so so that we can understand the scope of the

4   wrongdoing here and the violation of the subscription

5   agreements that are core to our complaint, in addition to

6   allowing ourselves to appropriately defend ourselves against

7   LegalEase's counterclaim.

8          We have sought discovery from LegalEase.  We

9   continue to think that they haven't been forthcoming as they

10  should as a party, but that's not why we're here.  Because

11  we're seeking injunctive relief in connection with this

12  case, we have -- we found that we were required to go to

13  ROSS to determine what ROSS received from LegalEase that is

14  protected material, that is material that was obtained in

15  violation of the contract, and to explore how that material

16  was possessed and why ROSS wanted it and what they've done

17  with it.

18         THE COURT:  Are you going to ROSS because you have

19  not been able to get LegalEase-produced documents, or are

20  you going to ROSS for this separate reason?

21         MR. LASHWAY:  So we're going to ROSS for both

22  reasons, Your Honor; both because we don't think that we've

23  obtained all of the necessary material from LegalEase, but,

24  in addition, and importantly for our motion here, because

25  ROSS is in receipt of information that was obtained in

1    violation of the contract, and we think we have a right to

2    understand how that third party has received that

3    information, what information they received, whether the

4    information they received violates the contract that

5    LegalEase had with us, what they knew about it.  And all of

6    this goes to inform the potential scope of injunctive relief

7    that we're seeking, Your Honor.

8         So with that, let me walk you through the

9    chronology briefly.  Because they're a third party, we tried

10   to narrowly tailor the scope of our subpoena.  We're not

11   trying to understand how ROSS's machine-learning client or

12   artificial intelligence technology works.  My client has

13   their own.  We don't care how ROSS does theirs.  What we are

14   trying to do is get forward what we view as discrete

15   categories of documents.

16        We issued a subpoena on June 14th.  ROSS's counsel

17   accepted service on June 20th.  Yet, by mid-September, three

18   months later, there still -- it was still clear to us that

19   we hadn't obtained all of the basic material that was called

20   for by the subpoena.  Now, counsel for ROSS had issued an

21   objection letter, which we accepted, and we said to them,

22   Rather than go back and forth on a letter-writing campaign

23   that will cost your client a lot of money as well as ours,

24   and rather than seek a motion to compel at that stage --

25   this was now in July, so 30 to 45 days after issuance of the

1    subpoena -- we said, Let's see what you are going to produce

2    and we'll assess it and we'll tell you whether we're

3    satisfied.  We thought that that was a very accommodating

4    position given that they're a third party in the case and

5    not an actual party.

6                Well, what proceeded was us having to follow-up

7    with them time and again pointing out that they hadn't even

8    committed -- they hadn't even produced the documents to

9    which they had committed to produce in their objection

10   letter.  So in August, we sent a follow-on letter that said,

11   We don't have these materials.  You said you were going to

12   give them to us, including the Slack communications.

13                THE COURT:  Let me just inform you, I've looked at

14   the briefs really closely and I have read all the

15   correspondence that's attached to it, so I am familiar with

16   the timing, and I know --

17                MR. LASHWAY:  Sure.

18                THE COURT:  -- that there were several letters and

19   e-mails that went back and forth --

20                MR. LASHWAY:  Sure.

21                THE COURT:  -- and communications and so on.

22                MR. LASHWAY:  So I'm leading up to a very

23   important communication.  In response to that, on

24   August 14th, ROSS says to us, Here are the search terms

25   we're going to explore.  But what they also said is we are

1    inclined to exclude Westlaw as a search term, quote,

2    unquote, because it contains a very large proportion of

3    false hits.  Well, it's not until just prior to filing the

4    motion that we actually get clarity as to what ROSS did or

5    didn't do to collect documents.  It's not clear to us how

6    the nine custodians were identified.  We're not looking for

7    just communications with LegalEase.  Presumably LegalEase

8    should have produced those.  We're trying to --

9              THE COURT:  When did --

10             MR. LASHWAY:  -- understand the internal

11   communications as to the use of the Westlaw data that's

12   been --

13             THE COURT:  When did you first let ROSS know you

14   were unhappy with their search terms or with the custodians

15   that were listed in their August 14th letter?

16             MR. LASHWAY:  So that was part of our continued

17   conversations.  There's another meet and confer on

18   August 20th, I believe --

19             THE COURT:  Uh-huh.

20             MR. LASHWAY:  -- in which we're continuing to ask

21   them where are the documents.

22             THE COURT:  Did you tell them that you were

23   unhappy with the search terms at the time?

24             MR. LASHWAY:  No.  Our position was if you want to

25   use search terms, so be it.  As long as I get the documents,

1     Your Honor, I'm going to be fine with it.  But ultimately by

2     September, when we finally get a production and there's

3     representations that that's it, it was clear to us then that

4     the search terms didn't work.  Our position, Your Honor, is

5     that we shouldn't have to decide what the search terms

6     should be.  My search term list would probably be 100 search

7     terms long.  I have no idea if those would be relevant or

8     not for ROSS.

9                THE COURT:  Let me put it this way, I understand

10    that, you know, perhaps it's ROSS's burden to first come up

11    with a list of search terms which they provided to you in

12    August, but I think that if you -- if you have additional

13    search terms or concerns about whether they're using

14    variants and so on, I'm struggling to understand with why

15    you didn't let them know that there were additional terms or

16    variants that you thought they should be using, or, if you

17    did, when did that happen and where can I find it in the

18    record?

19               MR. LASHWAY:  So, Your Honor, we did not

20    specifically engage in the search terms.

21               THE COURT:  Okay.

22               MR. LASHWAY:  We did not specifically say, You did

23    not look for the variations project that we've learned about

24    in September through follow-on productions and that we

25    learned about last week as we were continuing to take

1    depositions of LegalEase's witnesses.

2              THE COURT:  Okay.

3              MR. LASHWAY:  That hadn't been identified by

4    LegalEase.  We did not do that.  What we told them was,

5    Complete your production, we'll look at it and we'll let you

6    know if it's enough.  What we've heard -- sorry.  What we

7    have heard --

8              THE COURT:  Do you need a minute?

9              MR. LASHWAY:  I just had a hair in my mouth.  What

10   we have seen in response, though, is now a reliance on,

11   well, we ran search terms that we set -- that we

12   established, without our agreement, which I don't think is

13   proper, and, therefore, you get what you get, and you don't

14   get anything else.  And that certainly can't be the case,

15   Your Honor, when we did not agree to their -- to accept

16   their objections to limit the subpoena.  We did agree to

17   have patience with respect to their production.  And if they

18   had completed their production in August, we would have been

19   there then and said the search terms didn't work.  Instead,

20   they completed their production in mid-September, and we

21   told them, your collection and search didn't work, and we

22   want the rest of it.  And that's what's lead us to be here.

23             THE COURT:  And so have they refused to run

24   additional search terms?

25             MR. LASHWAY:  They have not been willing to

1    revisit their collection or their production in our view.  I

2    don't think they're entitled, Your Honor, even as a third

3    party, to say, We're going to limit our collection or the

4    way we review the documents, including by search terms, and

5    now it's your problem, the burden shifts to the Plaintiff or

6    the issuing party to say tell us how we got it wrong.  I

7    don't think that that's what Rule 45 permits.  I think

8    Rule 45 has some limitations around burden, but the issues

9    about burden, which we can address in a minute, aren't

10   relative to the search terms.  The search terms are

11   something they propose.  We said, Send us your production;

12   and we, to this day, are convinced that we still don't have

13   the documents that are called for by the subpoena, basic

14   documents, Your Honor.

15             THE COURT:  Okay.

16             MR. LASHWAY:  We're not looking for something

17   expansive here.  We just want the core stuff.

18             THE COURT:  Sure.  I understand.  One more

19   question about the search terms.  So have you -- to date,

20   have you sent ROSS a list of what terms you would propose,

21   these additional project names, et cetera, et cetera?  Has

22   that dialogue taken place?  No?

23             MR. LASHWAY:  We have not, Your Honor, no.

24             THE COURT:  Okay.  All right.

25             MR. LASHWAY:  We would be happy to engage in that

1    dialogue, but we're not convinced that ROSS actually is

2    willing to produce additional documents, and I think their

3    opposition bears that -- bears that out, so much so that

4    they had agreed to produce the documents that they've

5    produced to date.  We said, Great.  Produce them.  We'll

6    take a look.  And now they're turning around and asking for

7    some sort of cost-shifting with respect to the work they've

8    done to date.  And so certainly they're not offering to say,

9    Well, we'll revisit our entire production in light of the

10   complaints that you have been making for, you know, two-plus

11   months.

12            THE COURT:  I think their introduction says

13   they're not necessarily opposed to producing additional

14   documents.  I think the introduction of their brief says

15   that.

16            MR. LASHWAY:  And, Your Honor, when we talk about

17   specifics, like where's the Google Sheet, there's a lot of

18   attention paid to the 26,000 memos they produced, which were

19   only produced after we told them, You're missing 27,000

20   documents in Word format that LegalEase provided to you, and

21   counsel wasn't aware of that, which, again, that was the end

22   of August, leads us to believe that the search for documents

23   here has not been fulsome.

24            So, Your Honor, just a couple of more challenges

25   that we've faced in this matter.  There are things like a

 1    Google Sheet that sit in a Google drive that LegalEase

 2    testified to last week they don't have access to.  This was

 3    the document that was used by ROSS and LegalEase to frame

 4    the question that was answered.  I'll represent to the

 5    Court, in my understanding, my interpretation of the

 6    testimony we obtained last week from LegalEase executives

 7    was that those questions were being framed using Westlaw

 8    headnotes; that they were copied and pasted Westlaw

 9    headnotes trying to mimic West's key number system.  To me,

10    this is a core document, along with the material that was

11    prepared and sent by LegalEase to ROSS.  No one seems to

12    know where the Google Sheets are and no one has produced

13    them to date.

14            THE COURT:  And have you discussed that with

15    Mr. Lancaster?

16            MR. LASHWAY:  We've asked, Have you searched the

17    Google drive, have you searched Box accounts, are there

18    other materials?  They produced the memos in a .json format,

19    which LegalEase tells us last week they have never heard of

20    before.  So there seems to be some discrepancy here between

21    two parties that have had some sort of ongoing conversations

22    based on testimony last week, and we're left in the middle

23    as the Plaintiff saying, Can we please just finish document

24    production so we can move along the case to summary

25    judgment.

1            THE COURT:  Okay.

2            MR. LASHWAY:  Your Honor, I can address maybe just

3      quickly this issue about privilege.

4            THE COURT:  I would like you to address that, and

5      then, actually, I'd like you to go through each of the

6      current requests and let me know what you think is still

7      outstanding.

8            MR. LASHWAY:  Okay.

9            THE COURT:  Okay.

10           MR. LASHWAY:  So do you want me to do that first?

11           THE COURT:  Sure.  That would be great.

12           MR. LASHWAY:  And, Your Honor, I think we laid

13     this out in our reply in some detail in terms of what we're

14     looking for here.

15           THE COURT:  Uh-huh.

16           MR. LASHWAY:  So with Request 1 -- and do you want

17     to just read what they each are?

18           THE COURT:  No.  I have them here in front of me.

19           MR. LASHWAY:  Okay.

20           THE COURT:  So I understand Request 1 relates to

21     basically communications with Morae, Clutch, Kelly Services

22     and LegalEase India.

23           MR. LASHWAY:  Yeah, and frankly anyone else.

24           THE COURT:  Okay.

25           MR. LASHWAY:  And, Your Honor, as we set forth in

1    our reply -- and I'm literally just going to be walking you

2    through our reply brief, because that's what we tried to do

3    in our reply is to tell you here's what we think we're

4    missing -- the opposition to that, and our reading of it

5    says that they cannot, with total confidence, provide that

6    all relevant memoranda had been produced.  Morae Global,

7    Clutch Group, and Kelly prepared some of the -- what we call

8    answer files, what they call research memoranda, to ROSS.

9    It's unclear yet in the record as to whether Morae, Clutch,

10   or Kelly Services provided those directly to ROSS, but we

11   think they did, and we're going to be taking their

12   depositions, as you may recall.  Now, we understand ROSS's

13   position is that we don't have any communications.  What's

14   clear from the opposition is that they searched a limited

15   universe, and we would like a larger universe of custodians

16   or other documents to be searched, including what is

17   described as the ROSS portal, some technology web user

18   interface that allowed the provision of the data that was

19   taken from Westlaw to be shared with ROSS electronically

20   without the use of e-mail communications.

21                THE COURT:  Has your review of the documents to

22   date or your depositions identified any custodians in

23   addition to the nine that were identified by ROSS?

24                MR. LASHWAY:  No, Your Honor.  There are

25   references to -- but, again, we don't have the full

1    production, right, so we only have 900 internal e-mails on a

2    project that we think cost over half a million dollars, it

3    went on for two-plus years, that included six statements of

4    work, six different projects.  Our understanding is all of

5    them involved the use of Westlaw data.  Some of them may

6    have involved the use of Lexis data, which is obviously not

7    a party here.

8             Documents -- this is No. 2, documents and

9    communications concerning LegalEase's provision, either

10   directly or indirectly, of Westlaw information and

11   information derived therefrom to ROSS.

12             THE COURT:  Uh-huh.

13             MR. LASHWAY:  So we have 27,000-plus memos from

14   LegalEase.  We have 26,000 and change from ROSS.  What we

15   don't have is any communications as to how those memos were

16   formed -- this is the Google Sheets -- how the questions

17   were posed, and we don't have any internal communications at

18   ROSS discussing how the memos were used.  So what were they

19   doing with them?  One of our complaints is that LegalEase

20   was providing Westlaw data to a competitor to build

21   competing technology.  That's prohibited by the subscription

22   agreement.  We think we have the right to explore who knew

23   what about that when.

24             THE COURT:  And is it your sense that the

25   development of and the use of these documents provided

1    through the portal or through Google Sheets is going to be

2    described in the Slack communications?

3                MR. LASHWAY:  It could be.

4                THE COURT:  Because I think what I'm struggling

5    with here is that, you know, I've got a person -- or an

6    entity that's been served with a subpoena.  They looked at

7    nine custodians, and it sounds like we don't, right now,

8    have a sense for any other custodians you'd want them to

9    search.  And if I assume that they're -- you know, what they

10   have said in their brief is true -- in their affidavits is

11   true, it looks like they have done an investigation.  And so

12   what I'm wondering is what are the buckets of documents that

13   you think are missing?

14               MR. LASHWAY:  Yeah.

15               THE COURT:  So there's the Slack documents?

16               MR. LASHWAY:  The Slack communications.

17               THE COURT:  There's the Google Sheets?

18               MR. LASHWAY:  The Google Sheets.

19               THE COURT:  The ROSS portal?

20               MR. LASHWAY:  The communications through the ROSS

21   portal --

22               THE COURT:  Through the Ross portal.

23               MR. LASHWAY:  -- which would include all the

24   metadata associated with the transfer of the data, right?

25               THE COURT:  Uh-huh.

1          MR. LASHWAY:  So that would be any logging or

2     anything else showing the transfer of data, and then

3     internal communications about the use of the work product

4     that LegalEase provided to ROSS.  So what we have seen are

5     communications talking about dealings with LegalEase.  What

6     we haven't seen is, say, a communication between Mr. Van Der

7     Heijden and the engineers as to where the source of the

8     questions are coming from, because that's something that

9     Ms. Whitehead at LegalEase was following up on repeatedly.

10         THE COURT:  And do you think you don't have the

11    internal communications because there are internal e-mails

12    that are being withheld, or for what reason do you think

13    there are additional documents other than the Slack

14    documents?

15         MR. LASHWAY:  Our best guess, Your Honor, is

16    twofold; one, they could be withheld because of the

17    assertion of privilege; but other than that, we think that

18    they haven't been identified because of the limitation on

19    the custodians and the limitation on the search terms.  The

20    search terms that were proposed didn't yield the results

21    that we had all hoped for; and so here we are moving to

22    compel to say it didn't work.  It's that simple.  Let's go

23    back and revisit it.

24         THE COURT:  Okay.  I understand your point.  Is

25    there --

1          MR. LASHWAY:  I think that same category of

2   documents, Your Honor, would fall within Category 3.

3          THE COURT:  Uh-huh.

4          MR. LASHWAY:  And then with respect to Category 4,

5   we believe we have the agreements that is now the --

6   establishing the parties' contractual basis.  What we don't

7   have are any drafts of the agreements.  We were told by

8   Ms. Whitehead last week, who is the interface from

9   LegalEase's perspective, that she negotiated the terms of

10  the agreements along with their president, Tariq Hafeez.  We

11  can't find the negotiations in drafts, and so we think that

12  that's important because we want to understand whether or

13  not the reliance on Westlaw was a critical part of the

14  project scope.

15         THE COURT:  Okay.

16         MR. LASHWAY:  So, Your Honor, that answers, I

17  think, your question as to the categories that we're

18  seeking.

19         THE COURT:  And just for my clarification, is

20  there still a dispute over these LegalEase memoranda or is

21  that now resolved with the production of approximately

22  26,000?

23         MR. LASHWAY:  Well, there's going to be -- there's

24  going to potentially be a -- let me rephrase.  We're

25  confused as to why one party says, we sent over 27,000, and

1     the other party says, we only got over 26,000.  There's

2     about 1,000 memos missing, and we're confused about that.

3     And we're going to depose ROSS, and so that's certainly

4     going to be a topic of testimony.  We're also confused as to

5     frankly how the memos end up in a .json format that seems to

6     suggest there's more than 27,000 memos in our reading of

7     them.

8              THE COURT:  Okay.

9              MR. LASHWAY:  But we haven't finished that

10     exploration yet, Your Honor.

11             THE COURT:  Uh-huh, all right.

12             MR. LASHWAY:  And so certainly if there are

13     additional documents to be produced, we'd welcome them so

14     that the deposition is, you know, seven hours and we're done

15     and we can move to summary judgment.

16             Your Honor, as to the privilege -- and I'll keep

17     this one brief.  I think it's relatively straightforward --

18     we're not challenging the assertion of attorney-client

19     privilege as it's applied in the district.  What we are

20     challenging is the application of the privilege with respect

21     to Mr. Van Der Heijden's role.  Our understanding, based on

22     the communications we have, and based on the testimony to

23     date, is that Mr. Van Der Heijden was the primary interface,

24     having replaced another gentleman named Tomas, between ROSS

25     and LegalEase; that he helped orchestrate the transmission

1    of this material.  If he was also serving as a lawyer on

2    behalf of ROSS, that's news to us, but I'm not sure we're in

3    a position to actually have known that.  I've looked --

4    we've looked at his social media, which we attached to our

5    moving papers, and it appears to us that he's not acting or

6    at least not representing himself as a lawyer.  But looking

7    at the privilege log, Your Honor, and we point this out in

8    our reply brief, there is descriptions of the privilege to

9    us that are confusing, at best.  So we point one out which

10   talks about the facilitation of legal advice; e-mail to

11   facilitate the rendition of legal advice to client regarding

12   ROSS's legal processes and status of matters.  I don't know

13   what that is, and I have no way of assessing whether or not

14   that's truly privileged.  I also don't have any way of

15   assessing whether Mr. Van Der Heijden actually was operating

16   as a lawyer on behalf of the company.  Certainly there are

17   legal roles within companies, and Thomson Reuters and West

18   are certainly well aware of that.  A lot of their employees

19   are licensed lawyers, they're just not practicing law on

20   behalf of the company.  But we know that in order for the

21   attorney-client privilege to apply, there has to be a

22   specific request for legal advice or rendering of legal

23   advice, and it's not clear to us that that is what Mr. Van

24   Der Heijden was ever asked to do at ROSS.  So we invite the

25   Court to either take a fulsome review, or to take a sampling

1   of the documents that have been withheld, and evaluate

2   whether or not there's truly a basis for Mr. Van Der Heijden

3   to be applying privilege as a Canadian attorney doing work

4   in San Francisco.  I will share of the roughly 900 -- I'll

5   stop -- of their roughly 900 internal e-mails, we have

6   almost 400 that have been withheld on privilege.

7           THE COURT:  So I have some questions.  I'm trying

8   to understand if West is specifically objecting to the

9   assertion of privilege with respect to Mr. Van Der Heijden

10  because he is a Canadian lawyer, but not an American lawyer,

11  because that's a pretty complicated area of law.  And I

12  didn't see that really flushed out in your brief.  So what I

13  understand is you're saying, first of all, we think he was

14  operating in a business role, notwithstanding the fact that

15  he's a lawyer; correct?

16          MR. LASHWAY:  Correct.

17          THE COURT:  And then I understand you're saying

18  perhaps some of these communications, there's no reason to

19  think they were actually made in connection with a request

20  for legal advice or the provision of legal advice; right?

21          MR. LASHWAY:  Correct.

22          THE COURT:  And then there's been commentary about

23  his status as a Canadian lawyer.  But it's not clear to me

24  if all of those other conditions were met, if it was a

25  provision of legal advice, or, you know, a response for

1   legal advice, if he was acting in a capacity as a lawyer,

2   rather than as a business person, would you still be

3   objecting to the assertion of privilege on the grounds that

4   he is a Canadian lawyer?

5          MR. LASHWAY:  Your Honor, so we're taking a little

6   bit of a mixed approach there, quite honestly.  So if the

7   company is taking the position that Mr. Van Der Heijden, as

8   he's sitting in California -- and he's going to represent

9   that he did all of his work in Toronto, and we'll represent

10  back that LegalEase met with Mr. Van Der Heijden, we

11  believe, in San Francisco, and that they understood that he

12  worked out of San Francisco at times.  We're not inviting

13  the Court to go through a complicated cross-border analysis

14  in the application of legal privilege.  What we are saying

15  is that if he was operating as a lawyer, if he was appointed

16  to provide legal counsel to the company, then if he's

17  traveling to the United States, we're going to assume that

18  that privilege would attach, Your Honor.  But we also

19  believe that that's further evidence of the fact that he was

20  not operating as a lawyer on behalf of the company.

21          THE COURT:  Okay.

22          MR. LASHWAY:  Now, to be crystal clear, when

23  Dorsey & Whitney is retained and there's an assertion of

24  work product that follows Mr. Lancaster, we're not

25  challenging that.  That's clear as day that they were doing

1    work to help ROSS in connection with the litigation that we

2    brought.

3         THE COURT:  All right.  And how many of the

4    documents that are on the privilege logs that involve

5    Mr. Van Der Heijden are interROSS communications, I guess,

6    for lack of a -- introROSS communications rather than

7    Mr. Van Der Heijden communicating with Mr. Lancaster?

8         MR. LASHWAY:  I think it's a significant percent,

9    Your Honor.  I haven't done that count.

10        THE COURT:  Uh-huh.

11        MR. LASHWAY:  I can do it while Mr. Lancaster is

12   arguing, if you'd like, but I think it's a relatively high

13   amount.

14        THE COURT:  Okay.

15        MR. LASHWAY:  Yeah.

16        THE COURT:  All right.  And when did -- when did

17   you first meet and confer with ROSS about their privilege

18   log and the concerns that you have?

19        MR. LASHWAY:  So that was in September,

20   Your Honor, soon after receiving the privilege log from

21   Mr. Lancaster and his partner, and we raised concerns about

22   the assertion of privilege with respect to Mr. Van Der

23   Heijden.  We were obviously very surprised by this, given

24   the representations I have made to the Court.  We asked them

25   to revisit it, and the answer was he was acting in the

1    capacity of a lawyer.  As a company, we're going to stand by

2    our privilege assertions.

3              THE COURT:  Okay.  And with respect to the -- so

4    there's sort of that global issue, and then there's also

5    your concerns about the descriptions.  Did you also meet and

6    confer about the descriptions at the time?

7              MR. LASHWAY:  Well, we've raised the idea that we

8    can't sort out whether he was providing legal advice or not

9    given the status of the privilege log, yes, Your Honor.

10             THE COURT:  So you raised the concerns about the

11   descriptions?

12             MR. LASHWAY:  We raised concerns about the

13   privilege log globally and the assertion of privilege by

14   Mr. Van Der Heijden, yes.

15             THE COURT:  Okay.  And the response, in your view,

16   was that ROSS was refusing to reconsider, revise or

17   supplement its log?

18             MR. LASHWAY:  Well, I would maybe characterize it

19   differently in my memory, Your Honor.  My memory is that

20   they asserted that they believed that the privilege log was

21   sufficient for purposes of establishing privilege.

22             THE COURT:  Okay.

23             MR. LASHWAY:  And, Your Honor, I will share that

24   that was soon before we filed the motion to compel, so that

25   was a -- I think one phone call that we had.

1          THE COURT:  Have you had any follow-up discussions

2     with ROSS since you filed your motion to compel?  Have any

3     of these issues moved forward since you filed your reply

4     brief?

5          MR. LASHWAY:  Our follow-up discussions,

6     Your Honor, have been with respect to our filing of a

7     document that has now been clawed back.  ROSS's counsel took

8     issue with us filing a document that, in our view, was very

9     purposefully redacted and very purposefully unredacted.

10    That document has been clawed back pursuant to the

11    confidentiality order.  We completely disagreed with their

12    positions as to application of privilege.  We address this

13    in our reply.  But we've removed the document, pursuant to

14    the Court's confidentiality order, from our possession.  I

15    don't know if it's still sitting in the Court's docket, but

16    it is filed under seal as we filed it, and so we had a

17    conversation with Mr. Lancaster's partner about that issue.

18         THE COURT:  Okay.  And I have a couple of

19    questions about the Slack messages.

20         MR. LASHWAY:  Yeah.

21         THE COURT:  I don't know if you've got anything

22    more to say about those or --

23         MR. LASHWAY:  Not about the privilege, Your Honor,

24    no.

25         THE COURT:  Oh, okay.  All right.

1          So with respect to the Slack messages, you know, I

2     have read the correspondence and I see there was discussion

3     about West covering the costs.  And my sense is that West

4     is -- seems somewhat amenable to covering some of the costs

5     of the Slack production, or am I missing something?

6               MR. LASHWAY:  No, you are correct, Your Honor.

7               THE COURT:  Okay.

8               MR. LASHWAY:  What I haven't been able to do,

9     because I haven't been able to engage with my client

10     effectively on it, is what those costs would be.  And

11     they're not willing to pay for all of them, so the offer was

12     to pay for the costs, not the fees associated with Dorsey &

13     Whitney's review of the Slack communications.

14               THE COURT:  And at this point in time, we have

15     declarations where we know that the cost of the collection

16     apparently was $3,000, roughly, and then ROSS is estimating

17     the loading, review, redaction log and production costs of

18     about $10,000.  So we have a pretty defined world here,

19     and --

20               MR. LASHWAY:  Right.

21               THE COURT:  -- in view of ESI, it doesn't seem

22     like that big of a world.  And assuming -- I mean, I know

23     that ROSS can't perfectly predict what the costs would be,

24     but I'm wondering now if West is able to commit to some --

25     to some share of those costs since it sounds like you're

1    willing to -- you're willing to contribute to those costs.

2    We know it's going to be roughly under $15,000.  So is this

3    issue truly not resolvable at this point such that I need to

4    decide it?

5            MR. LASHWAY:  Well, Your Honor, I think there's a

6    nuance here that's important.  I don't think West is

7    offering to pay for the review of the Slack communications.

8    That's -- that's not necessarily required by the federal

9    rules.  They can produce the documents using search terms or

10   something else that we could agree upon and produce them.  I

11   don't see why West would be offering to pay for ROSS's

12   counsel's review for the application of privilege or

13   confidentiality treatment under the order.

14           THE COURT:  Is that the only part of the costs

15   that West would object to?

16           MR. LASHWAY:  I think the -- if there's a cost

17   certain that -- with respect to the technical collection and

18   processing for my client to consider, then we absolutely

19   would respond, but that's not what's been offered to us.

20           THE COURT:  All right.  Well, I think if ROSS

21   could provide you with an estimate for loading, redaction --

22   well, I suppose -- it sounds like you object to redaction

23   and logging -- but loading and production costs, I mean,

24   they can't give you a cost certain.  No one ever knows

25   exactly what ESI is going to cost until you're finished with

1    it.  They can give you an estimate from their vendor.

2              MR. LASHWAY:  Right.  But this is the internal

3    vendor at Dorsey & Whitney, Your Honor, as I understand it.

4    I mean, or the vendor we use can say this is what it's going

5    to cost.  It's going to cost between 3 and $5,000.

6              THE COURT:  And that's what we have.

7              MR. LASHWAY:  Well, what we have is $3,000 plus

8    another 10,000 for it to be reviewed, et cetera.  To me,

9    there's still no, you know, here's the invoice and we're

10   willing to take half of it and we'll split the costs with

11   you.

12             THE COURT:  What if they provided you with the

13   estimate from the vendor?

14             MR. LASHWAY:  Yeah, absolutely.

15             THE COURT:  Okay.

16             MR. LASHWAY:  Perfect resolution.

17             THE COURT:  I mean, this -- it's going to be an

18   estimate.  It's not going to be an invoice because nobody

19   knows what it will cost until after it's been done, so...

20             MR. LASHWAY:  Right.  And if the estimate doubles

21   in amount, then we'll be back in front of the Court of

22   course, right?  I mean, Your Honor, this is now science, as

23   you know full well having practiced.  There's estimates, but

24   it's also relatively straightforward.  The idea that Slack

25   communications present an unknown challenge, to me, is a

1    little bit of a complicated thing to digest.  There's some

2    discrete amount of Slack communications available for

3    collection.  There's going to be a cost associated with that

4    that we should be able to identify, and then there's going

5    to be a cost associated with the actual production of the

6    documents, running of search terms we can agree upon, and

7    then the production on some unknown amount, right?  The

8    first cost and the second cost should be relatively

9    determinable at this point since we've been talking about

10   this since July in our view.  And I also say only recently

11   did we get the quote for $3,000.  Before it was $9,000 plus

12   some, and apparently they've now incurred the $3,000 cost

13   after I think we've moved here.

14          THE COURT:  And if you can articulate for me why

15   West thinks the Slack messages are so important.

16          MR. LASHWAY:  Your Honor, so it's clear to us that

17   there was some form of communication being used about a

18   two-plus-year project in which there are literally thousands

19   of communications with LegalEase, yet only 900 produced by

20   ROSS, there was some other form of communication.  ROSS

21   hasn't -- to be clear, hasn't challenged the relevance of

22   the Slack communications.  They've only challenged the

23   burden, the cost associated with producing them.

24          THE COURT:  Certainly.  But importance of the

25   discovery is a factor in my analysis, so I'm trying to

1    understand -- if you can just articulate for me why you

2    think the Slack messages are important.

3            MR. LASHWAY:  So as I mentioned before, one of the

4    core categories we're missing from ROSS's production are the

5    internal communications about the use of these legal

6    research memos that, quote, unquote, LegalEase produced to

7    ROSS.  We think we have a right to understand if they were

8    used, how they were used, and what ROSS knew about them for

9    purposes of our injunctive relief.  And it is clear to us,

10   based on the production -- collection and production to

11   date, that we are missing internal communications.  We're

12   aware that Slack was used.  ROSS has made representations as

13   to the volume of Slack communications, which suggests that

14   it was used frequently for a relatively -- for a company

15   with a relatively small amount of employees.  And we have an

16   understanding, based on ROSS's representations to us, that

17   there are relevant documents and relevant communications in

18   those Slack communications.

19           THE COURT:  Okay.

20           MR. LASHWAY:  That pool that we're talking about.

21           THE COURT:  Okay.  One other question, is there

22   any dispute as to the production of the external emails from

23   ROSS at this time, setting aside Morae, Clutch, and Kelly?

24           MR. LASHWAY:  So, Your Honor, no.  We understood

25   that they had searched for all communications with

1    LegalEase.

2              THE COURT:  Uh-huh.

3              MR. LASHWAY:  And those would be the ones that

4    would have come up.  What we're not able to opine on, and

5    we're going to take representations at face value, is that

6    only those nine custodians were involved.  We don't have

7    other custodians to identify for you --

8              THE COURT:  Okay.

9              MR. LASHWAY:  -- other than the Google Sheet and

10   the Box and those forms of communication.

11             THE COURT:  All right.

12             MR. LASHWAY:  And, Your Honor, obviously we have a

13   significant disagreement as to the requests for

14   cost-shifting.  The costs incurred to date, in our view,

15   were things that ROSS committed to produce, and likely in

16   responding to our moving papers, which, in our view, ROSS

17   accepted knowingly and fully.  And we don't know, frankly,

18   and it's not articulated, how much of those costs are

19   associated with the actual production, how much of those

20   costs are associated with figuring out whether ROSS could be

21   potentially a party to the case.  I have no idea what the

22   counseling was involved in that.

23             THE COURT:  Okay.

24             MR. LASHWAY:  I can go into further detail on

25   that, but most of it is set forth --

```
1              THE COURT:  No.  I don't have any additional
2      questions in that regard.
3              MR. LASHWAY:  Thank you, Your Honor.
4              THE COURT:  Okay.  Thank you.
5              Mr. Lancaster.
6              MR. LANCASTER:  Sure.  And I -- I don't know what
7      position LegalEase is going to take.
8              MS. CEFALU:  LegalEase, in part, we defer to our
9      client, ROSS, as to the burdens.  A lot of the arguments, I
10     think it would make more sense if they respond first.
11             THE COURT:  I thought it made sense for
12     Mr. Lancaster to go first on behalf of ROSS and then hear
13     from LegalEase, but if -- is that agreeable to everyone?  It
14     seems to make sense to me.
15             MR. LANCASTER:  Certainly to us.
16             MS. CEFALU:  Certainly.
17             THE COURT:  All right.  Thank you.
18             MR. LANCASTER:  Thank you, Your Honor.  This is
19     one of the most unusual discovery arguments I have ever
20     participated in in that I don't know how the Court resolves
21     these conflicting things that the parties are saying about
22     what's been produced and when it was produced.  We, as the
23     Court noted, have submitted a declaration making various
24     statements.  We believe that everything has been produced
25     apart from the Slack messages, but let me say a couple
```

1     preliminary things.  I think this probably goes without

2     saying, I've talked on the phone to Ms. Cefalu probably a

3     couple times.  She's been more responsive to us than anyone

4     else at LegalEase.  I have a lot of sympathy with West's

5     frustration with LegalEase.  We are certainly not here to

6     defend them.  All I can say is that with the exception of

7     Ms. Cefalu returning my calls, but not in a position to

8     answer substantive questions, LegalEase treats us the same

9     way that it treats Westlaw, and we -- West, and we regard

10    ourselves as a victim of LegalEase, just as Westlaw is.

11            One other point, Your Honor, about the role of

12    LegalEase.  The brief, as you notice, is full of complaints

13    about LegalEase, which we have no argument with, but I do

14    think that it's worth keeping in mind that ROSS is not a

15    party to the case, and, in particular, what that means is

16    West is entitled to find out everything that LegalEase did

17    with West's information, and, as I -- if I am hearing

18    counsel correctly, there is no longer any argument about any

19    production as between ROSS and LegalEase.

20            With respect to the claims in the case, what

21    LegalEase did with West's information, that's not a ROSS

22    issue.  And all that's left that we're talking about are

23    these Slack messages which are obviously internal messages.

24    We don't see how those are relevant to the case at all, and

25    that's one reason why we have resisted.  Now, we have

1    produced lots of e-mails, internal e-mails.  We think that

2    even that goes beyond what's relevant to the case.

3            Now, some of the points that I'd be inclined to

4    make Your Honor has already made, but there are a number of

5    things that counsel said that -- that we do disagree with as

6    a factual matter as you might expect.  I'll speak first to

7    the role of Mr. Van Der Heijden.  And if something that

8    comes out of this is a certification or there is going to be

9    a deposition, which is going to be a very expensive event,

10   West can ask him questions to their heart's content.  But he

11   does obviously have both a dual business and legal role.

12   We've carefully distinguished between those.  Obviously no

13   communication that Mr. Van Der Heijden had with LegalEase

14   could possibly be privileged, and we have never claimed

15   that.  We're just talking about a portion of the internal

16   documents.

17           THE COURT:  You mentioned the certification, and I

18   know in West's reply, they stated several times that they

19   would be satisfied with -- setting aside the Slack and maybe

20   these portal and Google issues, satisfied with a

21   certification.  Is that something that ROSS is willing to

22   agree to?

23           MR. LANCASTER:  Absolutely.  And we can do that in

24   writing before a deposition.  We could -- and it can be

25   subject to cross-examination during a deposition.

1          THE COURT:  Okay.

2          MR. LANCASTER:  As to the fees that we've

3    incurred, both going back and going forward, this became an

4    incremental process where we kind of step-by-step, as the

5    fees mounted, the problem became more and more significant.

6    And the client has been charged $80,000.  That figure is not

7    made up.  About 20,000 of that is the costs, the inhouse

8    contract processing.  And those are costs just like, you

9    know, any other vendor costs, even though it's an inhouse

10   Dorsey set of contract reviewers.  Obviously when you're

11   producing documents, internal documents, you have to review

12   for privilege.  And how those should be excluded from the

13   burden that a third party should not have to bear in

14   connection with a subpoena, we frankly don't understand.

15   That's a cost of complying with the subpoena, just like all

16   these other costs are.

17          We cited to the Court a number of cases where even

18   an entity like U.S. Bank, when it incurred just $5,000 in

19   costs was entitled to be reimbursed.  We cited a case where

20   figures as low as $500 were entitled to be reimbursed.

21   These are all real-world expenses, Your Honor.

22          THE COURT:  With respect to the cost issue, I have

23   seen in the correspondence that you repeatedly brought up

24   the question of costs with respect to Slack with West

25   Publishing, but I'm not finding anything in the record where

1    ROSS would have put West on notice that they were seeking to

2    shift costs for anything other than Slack.  Can you point me

3    to something in the record?

4              MR. LANCASTER:  No.  That's fair, Your Honor.

5              THE COURT:  Okay.

6              MR. LANCASTER:  We raised that in the briefing.

7              I won't repeat the points that the Court made

8    about the timing of these various notifications.  One small

9    issue is -- and another example of the parties just talking

10   past each other in the briefing, we did produce all these

11   memos in the .json format long ago, a month before they got

12   reproduced in Word format.  And in its papers, West

13   continues to insist that that production didn't occur, and

14   it had to file a motion or threaten to file a motion in

15   order to get them.  But today was the first time that I have

16   heard an acknowledgment that, yes, they can review the .json

17   files.  Always before it was as if they did not exist.

18             Why don't I run through the four categories of

19   documents if that seems useful to the Court.

20             THE COURT:  Certainly.

21             MR. LANCASTER:  So the first category, so the

22   parties disagree about the history of this Morae and the

23   others.  So searching electronically does not remove the

24   application of human knowledge and some common sense, and so

25   we canvassed the people within ROSS who could have had some

1    communications with any of these entities, and they

2    indicated to us, no.  We then followed up, when West raised

3    questions about that, with a second search -- I shouldn't

4    say a second search -- a first search that confirmed what we

5    initially concluded.  And then when West complained some

6    more as if we had not said that, we conducted yet now a

7    second search, following first the application of human

8    knowledge and then two rounds of searches.  And they have

9    all been consistent.

10             THE COURT:  What's the difference between the

11   first and second round?

12             MR. LANCASTER:  Nothing.  Just confirmation.

13             THE COURT:  So in both times, I think Ms. Johnson,

14   is that who it was?

15             MR. LANCASTER:  Right.

16             THE COURT:  She had performed a search for those

17   terms on the collections of the nine identified custodians;

18   is that right?

19             MR. LANCASTER:  Correct.

20             THE COURT:  Okay.

21             MR. LANCASTER:  Correct.  But -- yeah.  That is

22   correct.  And so I think that's a dead issue.

23             In terms of LegalEase providing Westlaw

24   information to ROSS, if ROSS were inclined to hide

25   something, it would not have produced the actual Westlaw

1     information that was provided by LegalEase to ROSS.  And I

2     think the Court has heard before that LegalEase did not

3     produce that information.  And, again, that would be the

4     No. 1 thing that we'd be interested in hiding if that's the

5     way we were going about this.  I don't think that that's an

6     issue.  It was done back on August 14th, long before this

7     motion got filed.

8          All documents -- I'm paraphrasing of course -- all

9     documents relating to the ROSS relationship with LegalEase.

10    External, I don't think there's any remaining question about

11    that.  We used these search terms that we have had the

12    discussion about timing on for the internal communications.

13    We have not produced any Slack communications, which, for

14    the reasons I've stated, don't seem relevant to West's

15    claims against LegalEase.

16          THE COURT:  Can you address the Google Sheets, the

17    portal and Box?

18          MR. LANCASTER:  Yeah.

19          THE COURT:  Okay.

20          MR. LANCASTER:  The information within the Google

21    Sheets is contained within the questions that are part of

22    these question/answer memos.  So that information has all

23    been produced in that form, and I know that you just heard

24    the contrary from West, but that's something that we have

25    represented through a declaration and are glad to certify

1    again.

2           And then, finally, all documents relating to the

3    ROSS agreements with LegalEase.  Again, not a question of

4    any external documents.  We applied the search terms for the

5    internal documents.

6           THE COURT:  All right.  Can you go back to Box and

7    the portal and so on as well?  There was the ROSS portal

8    that West has raised, and then also they seem to think files

9    were exchanged on the Box system as well.

10          MR. LANCASTER:  You know, I -- I actually don't

11   know what they are referring to there, and if -- I can,

12   after I sit down, confer with my client to see whether he

13   knows, but I -- so far as I know, all the information that

14   ROSS would have provided to LegalEase is contained within

15   the memos --

16          THE COURT:  The memos and --

17          MR. LANCASTER:  -- by whatever portal they were

18   exchanged.

19          THE COURT:  Which you think was the Google Sheets?

20          MR. LANCASTER:  Right.

21          THE COURT:  Okay.

22          MR. LANCASTER:  Right.

23          I would say as to Slack, that West cites no case

24   in which production of such messages was ordered.  We're not

25   aware of any such case either because of this awesome

1    complexity of going through those documents.

2              THE COURT:  With respect to the search terms --

3              MR. LANCASTER:  Yes.

4              THE COURT:  -- you, I believe, did say in your

5    introduction that ROSS was willing to perhaps produce more

6    documents.  So is ROSS willing to engage in a discussion

7    with West about these additional terms that they would like

8    to propose?

9              MR. LANCASTER:  We are, Your Honor, but at this

10   point thousands upon thousands of documents have been

11   produced.  I do think West surely has enough information to

12   decide what additional search terms it wants.  So -- so but

13   are we willing to have a conversation about that?  We ran

14   into a roadblock because, okay, we made a proposal.  Could

15   you respond to our proposal?  And that's been going on for

16   months.

17             THE COURT:  Go ahead.

18             MR. LANCASTER:  That's all I've got to say,

19   Your Honor, subject to further questions from the Court.

20             THE COURT:  All right.  I did -- I think I did

21   have one question about your search terms and that's why I

22   was sort of thinking up here for a minute.  I wanted to know

23   how many of the 4,000 documents that hit on Westlaw were

24   duplicates of the documents that you've already produced?

25             MR. LANCASTER:  100 percent so far as we know.  We

1    don't think that Westlaw -- and our initial reaction was it

2    generates so many irrelevant items, but this is another one

3    of those things where, when challenged, we went back and did

4    run a search, and everything that contained Westlaw also

5    contained another search term, so we believe that category

6    is null.

7             THE COURT:  And you, I assume, would be able to

8    run some kind of report that would show that?

9             MR. LANCASTER:  I would assume so, yes,

10   Your Honor.

11            THE COURT:  Okay.  All right.

12            Turning to the privilege log --

13            MR. LANCASTER:  Yes.

14            THE COURT:  -- I have a -- I have a question, and

15   perhaps this is just a question of people having very

16   similar names, but I notice that it seems like Kurt

17   Niederluecke is listed as an attorney on ROSS's privilege

18   log, and doesn't he work at Fredrikson?

19            MS. FRIEDEMANN:  Indeed he does.

20            THE COURT:  So I'm wondering why -- and I can

21   direct you to this, Mr. Lancaster, if you have the record up

22   in front of you, but I'm just a little bit -- perhaps

23   there's a Kurt Niederluecke at ROSS Intelligence and there

24   are two of them in the world.  But on page 5 of 16 of docket

25   65-5, there are communications between Mr. Van Der Heijden

```
1    and Kurt Niederluecke, email chain seeking legal advice

2    regarding West versus LegalEase.

3              MR. LANCASTER:  Well, it probably goes without

4    saying there were no such communications between Mr. Van Der

5    Heijden --

6              THE COURT:  Or I think there would be a conflict

7    issue.

8              MR. LANCASTER:  Yes.

9              THE COURT:  So what that suggests to me is the

10   privilege log does need to be reviewed.  This is -- I mean,

11   I'll be issuing an order -- an order eventually, but when I

12   look at something like that, I think there are three entries

13   where Kurt Niederluecke is listed.  And, again, maybe

14   there's a Kurt Niederluecke at LegalEase, and we'll just all

15   find that out, but I note this is on page --

16             MR. LANCASTER:  No, I'm confident --

17             THE COURT:  Yeah.  Okay.

18             MR. LANCASTER:  -- there is not, and I never had

19   any communications with him either, which is the only way

20   that any communication with Fredrikson could have come to

21   the company, so that remains a mystery.

22             THE COURT:  Perhaps I'll just -- Ms. Friedemann,

23   are you able to shed any light on this at this time?

24             MS. FRIEDEMANN:  Not with confidence, Your Honor,

25   although I do recall that perhaps ROSS reached out to
```

1    Mr. Niederluecke, and then we said, no, we have a conflict

2    and we are unable to assist.

3              THE COURT:  You have a conflict?  I see, okay.  So

4    perhaps there is a reason for it --

5              MR. LANCASTER:  Okay.

6              THE COURT:  -- but it caught my eye.

7              MR. LANCASTER:  That's news to me.

8              THE COURT:  Sure.  And Dorsey is a fine firm as

9    well, so -- so I just -- it caught my eye, and it made me a

10   little bit concerned about a privilege log and the review

11   process just in general because it seemed unusual.  Perhaps

12   there is a rationale for that, in which case I apologize

13   and -- I guess I don't know if I need to apologize it caught

14   my eye, but I'm fine with the entries being there, but if

15   you could take a look at that.

16             MR. LANCASTER:  Sure.

17             THE COURT:  Yeah.  Okay.  Thank you.

18             MR. LANCASTER:  All right.  Thank you, Your Honor.

19             THE COURT:  All right.  Thank you.

20             Ms. Cefalu?

21             MS. CEFALU:  Thank you, Your Honor.  Your Honor,

22   LegalEase's position is simply that this is a Rule 45

23   subpoena, and obviously the -- whether or not the burden on

24   ROSS -- my client's, you know, former client -- is

25   unreasonable has to be viewed through the prism of the

1    claims at issue, No. 1.  As Mr. Lancaster pointed out,

2    they're not a party to this, and, to date, they have

3    produced -- I think that they've acted very reasonably.

4    They've produced 900 e-mails.  They've searched nine

5    different custodians.  They have produced the substantive,

6    you know, information that we have exchanged or thousands of

7    documents demonstrating what type of information was

8    exchanged between LegalEase and ROSS.  So our position, it

9    just seems to be that a number of things that West brings up

10   is that, well, the documents that we think you might have

11   were not produced, therefore, we don't think you produced

12   them, and that's not a valid objection to a subpoena.

13          We believe that -- we basically support ROSS's

14   position; and as to a number of the communications, for

15   example, the Google Sheet, we don't have access to it.  We

16   have to rely on their representations about what's in there,

17   and they're willing to certify that the information has

18   already been produced.  I think that that's reasonable.  I

19   also think the fact that they're not objecting to having a

20   deposition, they can be asked questions about that, and that

21   is a way of working around whether or not there's some grand

22   conspiracy.  I mean, I understand as a litigator people

23   serve subpoenas to try to verify whether or not there are

24   additional things out there, but you have to do it within

25   reason, and our position is that the claims at issue only

1    justify what has already been produced.  And as to whatever

2    else they're willing to work with Westlaw on, we are fine

3    with that, but we don't think that the claims at issue give

4    them the right to sort of harass and oppress one of our

5    clients, and so I think anything more than whatever ROSS is

6    willing to provide would be unreasonable.

7              THE COURT:  All right.  Thank you.

8              MS. CEFALU:  Thank you.

9              THE COURT:  Mr. Lashway.

10             MR. LASHWAY:  May I be heard just briefly?  Thank

11   you.

12             THE COURT:  Uh-huh.

13             MR. LASHWAY:  Your Honor, may I have the Court's

14   permission to hand up just three documents that have been

15   produced by ROSS in the case that help answer some of the

16   questions that have been raised by both?

17             THE COURT:  Do they have copies?

18             MR. LASHWAY:  I will hand them copies now,

19   Your Honor.

20             THE COURT:  Yes, you can give them to my clerk

21   here, Sam.

22             MR. LASHWAY:  So, Your Honor, just very briefly,

23   we've handed you three documents that have been produced by

24   ROSS in this case in response to our subpoena, for which we

25   appreciate that.  We have not found copies of these

1     documents in LegalEase's production.  For the record, they

2     may be there, but we haven't found them.  The first one,

3     Your Honor, addresses the points raised by Mr. Lancaster as

4     to the Google Sheets.  While the questions or the data may

5     exist in the .json files that have hundreds of thousands of

6     lines and indecipherable to us as to what they are, this

7     e-mail makes clear to us that ROSS was using a Google Sheet

8     to pose questions for LegalEase -- that Google Sheets called

9     questions for LegalEase.  Testimony has shown, thus far,

10    that LegalEase explored where those questions were coming

11    from.  It couldn't.  At some point in time, LegalEase

12    started posing questions to ROSS that were part of the

13    disclosures I made earlier were taken from headnotes in

14    Westlaw cases using the key number system.  Material that we

15    believe is protected and certainly would be in violation of

16    LegalEase's contractual rights.

17          The second document, Your Honor, which is called

18    the new ROSS memo system, gives you one explanation of one

19    of the portals that ROSS used to transmit and -- to transmit

20    Westlaw data and to communicate with LegalEase as to the

21    transmission.  We don't have any production of information

22    from either LegalEase or ROSS as to this ROSS automated memo

23    system that was shared between the two companies.  We

24    also -- just to be clear, we also don't have the video, and

25    there's other videos that are on YouTube that are password

1   protected that LegalEase believes they don't have access to

2   that were prepared by ROSS, we're told.  We don't have any

3   of those.  And our understanding is that those videos may

4   very well show how the memos were to be prepared using

5   Westlaw data and how they were to be transmitted and maybe

6   even how they were to be used by ROSS.  We don't know.

7          The third, Your Honor, is a letter from

8   Mr. Lancaster to counsel for LegalEase which may explain why

9   Ms. Cefalu is arguing on behalf of ROSS and its client.  Our

10  understanding is that ROSS has concerns, not only about its

11  productions in this case, but also about the production of

12  material that could be used purportedly by LegalEase to

13  reverse engineer their technology.  I know this because

14  Mr. Lancaster has made those assertions to me in one of our

15  very first phone calls.  That's exactly why there's a

16  confidentiality order in place, Your Honor.  It's two-tier.

17  We had anticipated, when we had arguments in front of the

18  Court on this topic, that there was going to be proprietary

19  information shared by the parties to the case and the third

20  parties.  And if that's a hindrance to the production of

21  material, that confidentiality order solves for that.

22          With respect to the memos, Your Honor, just to be

23  very clear as to the record --

24          THE COURT:  Just let me ask you, are you

25  suggesting that ROSS is withholding documents based on

1    confidentiality concerns?

2          MR. LASHWAY:  I don't know, Your Honor, but I do

3    know that I don't have all of the memos, and so no one can

4    explain to me where the 1,000 memos are.  And if you look at

5    the correspondence that I won't recite for you again, it is

6    clear that even during the collection process, we, counsel

7    for West, had to educate ROSS's counsel as to the fact that

8    there were 27,000 memos in Word that their supposed

9    collection failed to identify.  That's a very significant

10   percentage of their overall production in this case.  And we

11   only know that from our motion practice with LegalEase.

12         As for deposition testimony, Your Honor, I

13   certainly hope that ROSS's witnesses have a better

14   recollection as to a two-plus-year-long project than

15   LegalEase's.  But Ms. Whitehead who testified last week,

16   Ms. Cefalu's client, was fired two days before her

17   testimony.  Not clear if she's going to be rehired.  We

18   found that quite remarkable.  The CEO of LegalEase attended

19   the deposition, along with their counsel, which they

20   asserted objections during testimony, even though they

21   weren't representing the witness, and she failed to remember

22   nothing.  She did remember Mr. Van Der Heijden and said he

23   always wears scarves when they meet, but, yet, she claimed

24   that they only met once or twice.  She couldn't remember.

25   So there seems to be a problem for us in just getting to the

1   documents and getting to the material so we can move this

2   case along.

3           THE COURT:  All right.  Thank you.

4           MR. LASHWAY:  Thank you, Your Honor.

5           THE COURT:  Mr. Lancaster, is there anything you'd

6   like to add?

7           MR. LANCASTER:  Well, I really -- just one point,

8   and I'm repeating myself, but this issue about being

9   educated on the documents that were produced, it's the same

10  issue we've talked about a number of times, the production

11  of the .json files, which, in West's view, never happened.

12  They were applied -- supplied, and we didn't find out until

13  later that West couldn't figure out how to read them, so it

14  may well be academic at this point, but --

15          THE COURT:  Let me ask you a question.  Is ROSS

16  withholding any documents based on confidentiality concerns?

17          MR. LANCASTER:  No.

18          THE COURT:  All right.  Okay.  Thank you.

19          Well, I'm going to take the matter under

20  advisement and we will try to get -- I'll try to get an

21  order out as soon as possible.  In the meantime, I'll just

22  have -- make a couple of observations from the bench.  If

23  West has suggestions or proposed search terms that they

24  think that ROSS should be running, I think that they should

25  convey those and have a discussion about them.  I'm not

1      finding at this time that ROSS has an obligation to run

2      them, but I see no reason why that conversation should wait

3      for me to issue an order.  And I do think that, in view of

4      the fact that -- that ROSS has disclosed their search terms,

5      and West has now had the opportunity to go through their

6      production and take some depositions, I do think West is --

7      sounds like they have some search terms in mind, so go ahead

8      and talk about them with ROSS sooner rather than later just

9      so we can keep the case moving.

10             Also, if ROSS is able to provide an estimate with

11     respect to the Slack costs, Mr. Lancaster, I know that you

12     provided some type of estimate perhaps in an e-mail or a

13     declaration, but if it's a question of sending over a

14     document that breaks down those costs and you are willing to

15     do it, it seems like that might move things forward.  I will

16     take the motion under advisement and issue a ruling, but to

17     the extent the parties are able to work through some of

18     these issues and get them resolved in advance, you know,

19     that's always appreciated.  And you can let me know if that

20     happens, otherwise, I will decide the entirety of the

21     motion.

22             Anything further from West?

23             MR. LASHWAY:  Your Honor, the only thing is the

24     case schedule, so we've been pushing this out to accommodate

25     the scheduling of depositions.  As of right now, I believe

1    we have to complete depositions by next Friday, the 25th of

2    October.

3              MS. CEFALU:  That is correct.

4              MR. LASHWAY:  We have -- are working to schedule

5    two third-party depositions.  They likely will be done by

6    phone to accommodate locations and to try to address some

7    efficiencies and then, of course, there's the ROSS

8    deposition that we would like to proceed only after these

9    discovery issues are resolved.

10             THE COURT:  So if you want to file a proposed

11   amendment to the scheduling order, I will consider it and

12   take a look at it in view of your diligence.  And I think

13   you're all familiar with what's required under the local

14   rules when you seek an extension and the information that

15   has to be included, so I will, of course, take a look at

16   that if you seek an extension.

17             MR. LASHWAY:  Okay.  We'll work with Ms. Cefalu to

18   prepare something for the Court.

19             THE COURT:  I will say in view of the schedule, I

20   know we've had a couple of extensions so far.  That is

21   another reason why everyone should be talking to try to get

22   these issues resolved, and, you know, trying to collaborate

23   and cooperate on those issues.

24             So all right, Mr. Lancaster, anything further from

25   ROSS?

1          MR. LANCASTER:  (Shakes head.)

2          THE COURT:  All right.  Thank you.

3          Ms. Cefalu?

4          MS. CEFALU:  No.  Thank you, Your Honor.

5          THE COURT:  Thank you all for your arguments and

6     have a good rest of the day.  We're in recess.

7          THE LAW CLERK:  All rise.

8        (Court adjourned at 11:09 a.m.)

9                            *      *      *

10

11

12          I, Erin D. Drost, certify that the foregoing is a

13     correct transcript from the record of proceedings in the

14     above-entitled matter.

15

16                Certified by:   *s/ Erin D. Drost*

17                                Erin D. Drost, RMR-CRR

18

19

20

21

22

23

24

25